J-S52014-14

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| IN THE INTEREST OF: M.S., A MINOR | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: R.W., MOTHER | No. 3602 EDA 2013 |

Appeal from the Decree entered November 8, 2013,
in the Court of Common Pleas of Philadelphia County, Family
Co urt, at No(s): CP-51-AP-000007-2013,
CP-51-AP-0001290-2011

BEFORE: GANTMAN, P.J., ALLEN, and FITZGERALD*, JJ.

MEMORANDUM BY FITZGERALD, J.:                    **FILED OCTOBER 29, 2014**

R.W. (Mother) appeals from the decree entered in the Philadelphia County Court of Common Pleas, which involuntarily terminated her parental rights to her child, M.S. (Child), born in May of 2010.  We affirm.[1]

The trial court summarized the relevant factual history of this matter as follows.

> On April 25, 2011, the Department of Human Services (DHS) received a Child Protective Services (CPS) Report alleging that [Child] was suffering from failure to thrive, that Mother was not feeding the child solid food as instructed and was selling her Women, Infants, and Children (WIC) vouchers for money and that Mother lacked stable housing.  The CPS report was indicated.
>
> On June 8, 2011, DHS implemented In-Home Protective Services (IHPS) in Mother's home to address [Child's]

---

* Former Justice specially assigned to Superior Court.

[1] The court had terminated the parental rights of Child's putative father, M.A.S. (Father), approximately nine months earlier, on January 24, 2013. Father is not a party to the instant appeal.

failure to thrive and ensure he received proper medical care and to assist Mother in obtaining stable housing. On July 26, 2011, IHPS was discharged, and Mother began residing with [Child] at PathWays shelter. On November 28, 2011, DHS learned that Mother and [Child] left PathWays.

On January 9, 2012, Mother brought [Child] to the Children's Hospital of Philadelphia (CHOP) for treatment of a rash in his genital area, and upon examination, doctors discovered the child was suffering from burns from ankle to knee as well as a fractured right collarbone. Mother's explanation of how the child was burned was inconsistent with his injuries.

On January 10, 2012, an Order of Protective Custody (OPC) was obtained, and [Child] was placed in a foster home through Bethanna. A shelter care hearing was held on January 12, 2012 at which time the OPC was lifted, and the temporary commitment to DHS was ordered to stand. On January 2012, [Child] was adjudicated dependent and committed to DHS.

Throughout the pendency of this case, Mother's Family Service Plan (FSP) goals have remained to: 1) attend a mental health assessment and comply with the recommendations; 2) sign necessary releases; 3) complete a parenting course; 4) obtain her GED or engage in vocational training; 5) maintain visitation with [Child]; 6) maintain her physical health; and 7) obtain housing.

Trial Ct. Op., 1/8/14, at 2-3 (citations to record omitted).

On January 9, 2013, DHS filed a first petition to terminate Mother's parental rights to Child. The trial court held a hearing on January 24, 2013, but denied the petition.

DHS filed a second termination petition on August 23, 2013. A termination hearing was scheduled for September 10, 2013, but Mother's counsel failed to appear. DHS filed the underlying, third termination petition

on October 3, 2013.  On November 8, 2013, the court held a hearing.  At the conclusion of the hearing, it entered the instant decree terminating Mother's rights pursuant to Subsections 2511(a)(1), (2), and (5), and (8) and 2511(b) of the Adoption Act.[2]

Mother timely filed a notice of appeal, along with a statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i).  She raises the following issues for our review:

> 1.  Whether the trial court committed error by involuntarily terminating [M]other's parental rights where such determination was not supported by clear and convincing evidence establishing grounds for termination under the Adoption Act, 23 Pa.C.S.A. §§2511 (a)(1), (a)(2), (a)(5), and (a)(8)?
>
> 2.  Whether the trial court committed error by involuntarily terminating [M]other's parental rights and changing the permanency goal from reunification with the parent to adoption without giving primary consideration to the developmental, physical and emotional needs and welfare of the child as required by the Adoption Act, 23 Pa. C.S.A. §2511(b)?

Mother's Brief at 5.

We first address the portion of Mother's second issue challenging the goal change from reunification to adoption.  Mother's brief includes no specific argument or relevant authority on this issue.  Accordingly, we hold any claim concerning the goal change is waived because Mother has not developed her claim in any substantive way.  ***See Green v. Green***, 69 A.3d

---

[2] 23 Pa.C.S. §§ 2101-2938.

282, 285 n.3. (Pa. Super. 2013).

We next consider the trial court's suggestion that this appeal should be dismissed because Mother's Pa.R.A.P. 1925(b) statement of errors complained of on appeal "set[ ] forth boilerplate language without any indication of the substance of the appeal." Trial Ct. Op. at 4. The court cited the following Superior Court authority:

> "[T]he Rule 1925(b) statement must be specific enough for the trial court to identify and address the issue an appellant wishes to raise on appeal." Further, this Court may find waiver where a concise statement is too vague. "When a court has to guess what issues an appellant is appealing, that is not enough for meaningful review." . . .

*See In re A.B.*, 63 A.3d 345, 350 (Pa. Super. 2013) (citations omitted).

In the present case, Mother's 1925(b) statement averred in pertinent part: "The trial court's ruling to involuntarily terminate [M]other's parental rights to her child was not supported by clear and convincing evidence establishing grounds for termination, and that such ruling would be in the child's best interests." Mother's Statement of Errors Complained on Appeal, 12/9/13.

The issue, as articulated, is not a model of clarity or particularity. While the trial court terminated Mother's rights under Subsections 2511(a)(1), (2), (5), and (8), the 1925(b) statement fails to identify which subsection, let alone which particular element of these subsections, she challenges. Nevertheless, given the relatively straightforward statutory analysis at issue, as well as the trial court's ensuing discussion of its decision

to terminate under each subsection, we decline to find waiver. **See**
**Commonwealth v. Laboy**, 936 A.2d 1058, 1060 (Pa. 2007) (finding issue
not waived in "relatively straightforward drug case" where 1925(b)
statement merely stated evidence of drug trafficking and conspiracy was
insufficient, without specifying what element Commonwealth allegedly failed
to prove, and where trial court readily apprehended defendant's claim and
addressed it in substantial detail). Accordingly, we proceed to address
Mother's challenge to the termination of her parental rights.

First, Mother avers the court erred in terminating her parental rights
under Subsections (a)(1), (2), and (5).[3] The crux of her argument is that
DHS did not enact a meaningful reunification plan and "failed to make any
reasonable attempt or effort to assist" her. Mother's Brief at 18. Instead,
she maintains, DHS "rushed to hurry the family along toward the adoption
route," as evidenced by its filing its initial termination petition "less than one
year after the case's onset." **Id.** Mother also contends that because the
court denied a prior termination petition, it could "only consider new
testimony and evidence for the ten month period from January 2013 until
November 2013," and that during this period, her compliance with the FSP,
"which was determined by the court to be sufficient to deny DHS' original

---

[3] Although Mother's statement of questions involved also averred a challenge
under Subsection (8), she provides no discussion relating to that portion of
the statute. Nevertheless, as we discuss **infra**, we affirm the trial court's
termination under Subsection (a)(2).

petition[,] did not regress or lapse[.]" *Id.* at 20. Mother avers that although housing was "one of the critical issues in this case," "DHS did not . . . even find or locate one possibility." *Id.* at 18. With respect to establishing grounds for termination, Mother asserts DHS did not present any evidence as to her "foreseeable prospects regarding her housing," employment status, or family members who could be potential caregivers for Child. *Id.* at 20. Meanwhile, Mother cites her own testimony about "employment leads and a housing plan that was to be realized shortly within a few months." *Id.* at 22. We find no relief is due.

We note the relevant standard of review.

> The standard of review in termination of parental rights cases requires appellate courts "to accept the findings of fact and credibility determinations of the trial court if they are supported by the record." "If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion." "[A] decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will." The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (citations omitted).

Termination of parental rights is governed by Section 2511, which requires a bifurcated analysis:

> Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the

statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted). "[W]e need only agree with [the trial court's] decision as to any one subsection in order to affirm the termination of parental rights." *In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*).

Subsections 2511(a)(2) and (b) state:

**(a) General Rule**.—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

* * *

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

* * *

**(b) Other considerations**.—The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing

and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(2), (b).

This Court has stated:

In order to terminate parental rights pursuant to 23 Pa.C.S.A § 2511(a)(2), the following three elements must be met: (1) repeated and continued incapacity, abuse, neglect or refusal; (2) such incapacity, abuse, neglect or refusal has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being; and (3) the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied.

*In re Adoption of M.E.P.*, 825 A.2d 1266, 1272 (Pa. Super. 2003). "The grounds for termination due to parental incapacity that cannot be remedied are not limited to affirmative misconduct. To the contrary, those grounds may include acts of refusal as well as incapacity to perform parental duties." *In re A.L.D.*, 797 A.2d 326, 337 (Pa. Super. 2002) (citations omitted).

At the most recent termination hearing in the instant case, Yvonne Queen, a DHS social worker and case manager for Child for the past two years, testified as follows. After Child was adjudicated dependent in January of 2012, DHS developed the following FSP goals for Mother: attend ARC services, maintain visitation with Child, "work with GED, job skills, mental health" and "parenting," and sign releases for Child. N.T., 11/8/13, at 5-6. Prior to the first termination hearing in January of 2013, Mother "completed

parenting at Bethana." *Id.* at 7. After the first termination hearing, she attended "about five sessions" at ARC and her participation there was "sporadic." *Id.* at 7. However, Mother failed to engage in mental health services and complete either a job skills program or a GED program. *Id.* at 7-9. Mother also failed to obtain stable housing. *Id.* at 11. Ms. Queen referred Mother "to OSHA, because she was on the waiting list for Shelter Plus and the criteria [for a housing unit] was that she had to be in a shelter." *Id.* at 8. However, Mother "didn't want to go into OSHA [and] preferred to stay with family and friends." *Id.* at 9. As of the date of the termination hearing, Mother was still living "with family friends, not stable." *Id.*

Bethany Leahy, DHS social worker, testified to the following. Mother's visits with Child are "weekly for two hours," occur at DHS' office and in the community, and are supervised. *Id.* at 22. Mother was "very consistent[ ]" with visits, has only missed visits due to illness, and once missed a visit in February or 2013 "when she relocated to Pittsburgh."[4] *Id.* at 22. Mother is "not able to effectively set boundaries for" Child, and Ms. Leahy intervenes when Child becomes bored with an activity and "begins to act up," such as "touching . . . the microwave and the dishwasher, running out of the room, being very loud and disturbing other visitors in the office." *Id.* at 23. Even after Mother completed a parenting class in 2012, Ms. Leahy needed to

---

[4] Mother denied she had moved to Pittsburgh, and stated that instead she had merely visited. N.T. at 38.

- 9 -

redirect Mother during visits. *Id.* at 23. Mother's visits with Child "have remained supervised with direct line of sight because there is concern . . . that she can be inattentive a times," which allows Child "to get into some type of unsafe or inappropriate situation." *Id.* at 23-24. Additionally, Mother initially did little to engage with Child during visits. *Id.* at 24. While Mother has improved over time, "it is not consistent at every visit and it is not consistent throughout the visits." *Id.* "There have been some visits just within the last few months that were in relatives' homes where [Mother] spent a good part of the visit cooking while [Child] was either sitting in front of the television or [Ms. Leahy] was keeping him entertained." *Id.* Mother did "[n]ot always" choose age appropriate activities for Child and she occasionally ignored Child's wishes in favor of what she would rather do. *Id.* at 28.

Mother testified at the second termination hearing as follows. She started a GED program at OIC but completed "[o]nly a couple of weeks, because [she] didn't have any income and they didn't provide transportation." *Id.* at 35. She stopped attending because DHS did not provide her transportation tokens. *Id.* Mother then attended a GED program at ARC, and, while DHS provided tokens, they did not provide enough tokens for a transfer. *Id.* at 36. Mother needed only to complete math classes and take the GED test in order to earn her GED. *Id.* at 36-37. She had a part-time job for a couple months "selling ATM machines to . . .

malls and medium sized businesses," but her team leader told her not to work there anymore because the job required her to travel to three to five stores a day and she did not have a car. *Id.* at 37. As of the date of the hearing, Mother was not employed, but she had a job interview at Macy's later that day. Since October of 2012, Mother lived at her friend J.'s apartment, where she had her own bedroom. *Id.* at 38-39. The apartment was appropriate for overnight visits with Child, and Child would have his own bed. *Id.* at 40. Mother denied living at different addresses, stating: "The only address that I actually gave that I was actually living at since then, was (inaudible). I do visit a lot of residents and I might stay for a couple of weeks—to visit, not to say I live there." *Id.* at 38. Additionally, she stays at "different relatives' house[s] because [J.] is not home that much and [Mother does not] like to be home alone." *Id.* at 40. If Mother got the job at Macy's, she would be able to obtain "different housing" in three to four months. *Id.* at 43-44. Mother "[s]ometimes receives money from her mother or for doing hair and receives food stamps. *Id.* at 46.

With respect to mental health treatment, Mother stated the following. Since the last court date, she "spoke[ ] to a therapist a couple times at [her] Doctor's office." *Id.* at 41. Mother also stated she has therapy once a month at the doctor's office. *Id.* at 45. However, she did not receive mental health treatment through ARC, nor did she inform DHS that she was treating with a private mental health provider. *Id.* at 41, 46. Mother takes

medication, but he did not want to disclose her mental health diagnosis.  *Id.* at 42.

At the termination hearing, the trial court ruled:

> The issues are quite clear.  I visited the issues last year and again, visited the same issues and [Mother] had been given essentially a year and has done nothing to remedy the issues that originally brought the child into care.  She has not advanced beyond the same position she was in a year ago when the Court gave her a benefit of the doubt.
>
> Now, the benefit of the doubt no longer exists.  It is clear that [Mother] is unable or willing to remedy the issues that brought the child into care and the agency has established by clear and convincing evidence pursuant to Sections 2511A-1, 2, 5 and 8 and 2511B, such that maternal rights are terminated.  . . .

*Id.* at 47.  *See also* Trial Ct. Op. at 6.  In its opinion, the court reasoned:

> . . .  In January [of 2013], Mother was consistent with visitation and signing releases and had completed a parenting course.  In November, Mother's progress toward her goals remained unchanged, and her inability to parent her child at any time in the near future was evident.

Trial Ct. Op. at 6.  The court considered the testimony at both the January 2013 and November 2013 hearings and found that Mother made no progress during the interim.  The court emphasized Mother's lack of stable housing and employment, as well as her failure to complete mental health treatment and obtain her GED.  *Id.* at 7.

Although Mother avers the court was prohibited from relying on evidence adduced at the first termination hearing and could only consider evidence pertaining to the ten months immediately preceding the later

termination hearing, she provides no legal authority in support. ***See*** Mother's Brief at 20. Mother's claim that DHS failed to make reasonable attempts to assist her is meritless. Instead, both DHS social workers, Ms. Queen and Ms. Leahy, testified that that they referred Mother to GED and housing programs. In light of all the foregoing, we hold the court did not abuse its discretion in finding Mother cannot or will not remedy the conditions for Child's placement under Subsection 2511(a)(2). ***See*** 23 Pa.C.S. § 2511(a)(2); ***In re Adoption of M.E.P.***, 825 A.2d at 1272.

Mother's second argument on appeal is that the court failed, under Subsection 2511(b), to give primary consideration to Child's needs. She maintains that termination was not in Child's best interest because "[n]o consequential evidence of any bond or description of relationship between [Child] and [Mother] was ever presented for the court's consideration." Mother's Brief at 24. Mother further claims "the court did not have any information[,] including . . . an independently conducted bonding evaluation by a licensed therapist or clinical child psychologist[,] to consider when determining what detrimental effect involuntarily terminating herrights might have on" Child. ***Id.*** Mother emphasizes her own testimony that Child "loves her and calls her 'Mommy,'" and asserts that the "more credible evidence at trial" demonstrated a parent-child bond. ***Id.*** at 25.

This Court has stated:

> Subsection 2511(b) focuses on whether termination of parental rights would best serve the developmental,

physical, and emotional needs and welfare of the child. [T]his Court stated, "Intangibles such as love, comfort, security, and stability are involved in the inquiry into the needs and welfare of the child." In addition, we instructed that the trial court must also discern the nature and status of the parent-child bond, with utmost attention to the effect on the child of permanently severing that bond. However, in cases where there is no evidence of a bond between a parent and child, it is reasonable to infer that no bond exists. Accordingly, the extent of the bond-effect analysis necessarily depends on the circumstances of the particular case.

*In re Adoption of J.M.*, 991 A.2d 321, 324 (Pa. Super. 2010) (citations omitted).

"[T]he mere existence of a bond or attachment of a child to a parent will not necessarily result in the denial of a termination petition." *T.S.M.*, 71 A.3d at 267. "Common sense dictates that courts considering termination must also consider whether the children are in a pre-adoptive home and whether they have a bond with their foster parents." *Id.* at 268. Moreover, in weighing the bond considerations pursuant to section 2511(b), "courts must keep the ticking clock of childhood ever in mind. Children are young for a scant number of years, and we have an obligation to see to their healthy development quickly. When courts fail . . . the result, all too often, is catastrophically maladjusted children." *Id.*

Furthermore, "[i]n analyzing the parent-child bond, the orphans' court is not required by statute or precedent to order a formal bonding evaluation be performed by an expert." *In re K.K.R.-S.*, 958 A.2d 529, 533 (Pa. Super. 2008). A court may terminate parental rights based in part on a

social worker's and a caseworker's testimony that a child did not share a significant bond with his parents and was well-bonded with his foster parents. *In re T.M.T.*, 64 A.3d 1119, 1128 (Pa. Super. 2013) (citation omitted).

Here, the trial court concluded that termination of Mother's parental rights was in Child's best interest. Trial Ct. Op. at 10-11. The court emphasized testimony that Mother and Child do not have a parent-child bond, Child is bonded with his foster mother, and Child has "thrived" since being placed in foster care. *Id.* at 10. The court also noted testimony that Child would not suffer irreparable harm if Mother's parental rights were terminated. *Id.* at 11.

We hold the record supports the trial court's findings. Ms. Queen testified that she observes Child interact with his foster mother every month when she visits the home, and that it would be in Child's best interests to be adopted by his foster mother. N.T., 11/8/2013, at 9. Ms. Queen stated that Child was "delayed in speech," and that he was "very hyperactive," but that he had "progressed and thrived" in foster care. *Id.* Ms. Queen stated that termination would not cause "any permanent harm" to Child because "right now Mother is not really stable, with herself. She has to address her needs, Mom needs to get herself together as far as permanency, as far as job skills, being ready to parent. There are still things that I see that Mother needs to grow on." *Id.* at 10-11.

Ms. Leahy testified that Child has no difficulty leaving Mother when a visit is over. *Id.* at 25. She stated that Child calls his foster mother "Momma," that Child and his foster mother have a "parent/child bond," and that Child looks to foster mother "to meet his physical needs, his emotional needs. It's very warm, nurturing and loving." *Id.* Ms. Leahy agreed that Child's "speech therapy was discontinued in December 2012, because he had made significant progress. He now has a very good vocabulary, very good speech. His behavior has improved significantly, as well." *Id.* at 21. She stated that it was in Child's best interests to be adopted because of his strong bond with his foster mother, because he has made "significant progress" with foster mother, "[a]nd because [Mother] continues to be unstable in her living situation and this is a child who requires a lot of stability, a lot of structures, in order to function well, and get the services that he needs." *Id.* at 26-27. Ms. Leahy opined that Child would not suffer irreparable harm in Mother's rights were terminated. *Id.* at 27. She explained that Child calls Mother "Mommy," and is excited to see Mother during visits, "because he knows during visits he is probably going to get to go out to McDonald's or get some ice cream. But there does not seem to be a parent/child bond there where he is looking for her to meet those physical and emotional needs." *Id.* She noted that Child is safe, and his needs are being met in foster care. *Id.* at 28.

While Child may enjoy seeing Mother, this alone is not determinative.

*See T.S.M.*, 71 A.3d at 267. The trial court was not required to order a formal bonding evaluation, and instead was free to accept Ms. Leahy's testimony. *See In re T.M.T.*, 64 A.3d at 1128; *In re K.K.R.-S.*, 958 A.2d at 533. Thus, it was reasonable for the court to conclude that it would be in Child's best interests if Mother's parental rights were terminated, and that Child would not suffer irreparable harm. We discern no abuse of discretion.

Accordingly, because we conclude that the trial court did not abuse its discretion by terminating Mother's parental rights to Child pursuant to Sections 2511(a)(2) and (b), we affirm the decree of the trial court.

Decree affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: <u>10/29/2014</u>