**In the Interest of T.M.T., Jr., a Minor.**

**Appeal of T.T., Father.**

**In the Interest of N.C.T., a Minor.**

**Appeal of T.T., Father.**

Superior Court of Pennsylvania.

Submitted Jan. 28, 2013.
Filed April 8, 2013.

---

**2.** M.K. testified that Appellant used a cell phone, but M.K. only saw Appellant use it after the accident. N.T. at 10.

Joseph A. Capozzoli, Philadelphia, for appellant.

Patricia A. Korey, Public Defender, Philadelphia, for T.M.T. and N.C.T., appellees.

Arnold F. Laikin, Philadelphia, for J.T.J., appellee.

Jeri H. Behrman, Philadelphia, for Philadelphia Dept. of Human Services, appellee.

BEFORE: FORD ELLIOTT, P.J.E., LAZARUS and MUSMANNO, JJ.

OPINION BY FORD ELLIOTT, P.J.E.:

T.T. ("Father") appeals from the orders entered by the trial court that changed the goals for his dependent children, T.M.T. (born in August 2007) and N.C.T. (born in June 2009) ("the Children") to adoption and terminated his parental rights.[1] We affirm.

The family became known to the Philadelphia Department of Human Services ("DHS") on July 29, 2009, when DHS received a general protective services report alleging medical neglect. More specifically, the report alleged that T.M.T. suffered from congenital glaucoma and he lacked appropriate medical treatment. The report alleged that since December 2007, T.M.T. had not been examined by an ophthalmologist and that without proper treatment and follow-up, he could lose his eye sight or his eyes. Additionally, the report alleged that on July 27, 2009, T.M.T.'s mother, J.J., contacted the Ophthalmology Department of Children's Hospital of Philadelphia ("CHOP") and stated that T.M.T. had a discharge from his eye and related problems. J.J. was advised to take the child to CHOP immediately; however, she stated she could not take him at that time. J.J. failed to take T.M.T. to the hospital or for a follow-up with CHOP.

From July 29, 2009 to August 21, 2009, DHS conducted several investigations, telephone calls and outreach to Father and J.J., their family members and other individuals who knew them. DHS learned that Father and J.J. had another child, N.C.T., who was two months old at that time and who also suffered from eye problems. On August 21, 2009, DHS visited the family home and found it in deplorable condition. On that same day, DHS filed a motion to compel cooperation with DHS' investigation regarding the July 29th general services report, and DHS obtained an order of protective custody for the Children and placed them both in a Children's Services Inc. ("CSI") foster home.

On August 25, 2009, Father rendered a drug and alcohol sample to the Clinical Evaluation Unit ("CEU"). Father's sample tested positive for cannabis. The CEU report noted that the test was flagged "high."

On February 9, 2010, DHS held a family service plan ("FSP") meeting for the family. The FSP goal was reunification. The objectives were to undergo drug and alcohol evaluations and to comply with treatment recommendations; to sign authorizations for releases for treatment records; to locate and occupy suitable housing; to attend ophthalmology appointments for T.N.T.; and to visit with the Children. Father attended the meeting and signed the document.

On February 12, 2010, Father rendered another drug and alcohol test sample to the CEU. Father tested positive for cannabis. Father's substance abuse issues were evaluated by the CEU on that date. Father provided a brief history of his substance abuse, noting that he began using marijuana at age 16. He stated he smokes one to two blunts a day. Although Father stated he last used marijuana in December

---

1. The trial court also terminated the parental rights of J.J., the mother of the Children. J.J. has not challenged the termination of her parental rights.

of 2009, he tested positive on February 12, 2010 at the highest level. The CEU report noted that Father minimized his drug use. The report recommended that Father engage in intensive out-patient treatment, including random drug screens at the Wedge Medical Center.

On March 18, 2010, the CEU issued a report of non-compliance for Father. The report noted that the Wedge therapist assigned to Father stated that Father missed his scheduled appointment on March 2, 2010, and Father did not respond to the outreach letter sent by the CEU. The report recommended Father be re-evaluated by the CEU.

On March 25, 2010, an adjudicatory hearing was held, and the Children were adjudicated dependent due to medical neglect. On that same date, the trial court found the parents were non-compliant with the CEU and referred them again to the CEU and to the Achieving Reunification Center ("ARC") and also to parenting classes. Father was re-evaluated by the CEU on March 29, 2010. After submitting a sample on March 28th, Father tested positive for marijuana. Despite being referred for intensive out-patient treatment at the Wedge Medical Center, Father had no treatment history. Father was once again referred to Wedge. On January 22, 2011, the CEU issued a report of non-compliance for Father.

In July, 2011, a permanency hearing was held. J.J. raised concerns that the Children were not being adequately cared for at their grandmother's home. As a result, the trial court ordered the Children removed from that home. The court also ordered that Father's visitation be increased to unsupervised day visits. On August 11, 2011, DHS held an FSP meeting for the family. The parental objectives remained the same, and the FSP goal remained reunification.

On September 8, 2011, Father had an unsupervised visit with the Children and failed to return the Children to their foster home at the designated time. The Children were returned the following day. While Father claimed a bomb scare prevented him from returning the Children on time, when DHS attempted to verify Father's story, the phone number Father provided was inoperable. This incident resulted in Father's visits changed to supervised visits at the foster care agency.

On December 27, 2011, Father was once again re-evaluated at the CEU. The report produced by the CEU noted that Father tested positive for marijuana on December 19, 2011 and December 27, 2011. Father admitted that he had never engaged in any treatment. On January 11, 2012, DHS held another FSP meeting for the family, and the goal was changed to adoption. The parental objectives remained the same.

On March 20, 2012, DHS filed a petition to terminate Father's parental rights and to change the Children's permanency goal to adoption. On April 4, 2012, Father pled guilty to one count of manufacturing, delivery or possession with intent to deliver a controlled substance. The criminal complaint indicated that the substances involved included heroin. Father was sentenced to two years' probation.

At the time of the July 20, 2012 termination of parental rights hearing, Father was incarcerated. At the conclusion of the hearing, the trial court terminated Father's parental rights. This appeal followed.

■ Father raises the following questions for our review:

1. Whether the trial court committed reversible error, when it involuntarily terminated father's parental rights where such determination was

not supported by clear and convincing evidence under the adoption act, 23 Pa.C.S.A. § 2511(a)(1), (2), (5) and (8)?

2. Whether the trial court committed reversible error when it involuntarily terminated father's parental rights without giving primary consideration to the effect that the termination would have on the developmental, physical and emotional needs of the child as required by the adoption act, 23 Pa.C.S.A. § 2511(b)?

Father's brief at 4.[2]

 The standards governing our review of an order terminating parental rights are well settled:

When reviewing an appeal from a decree terminating parental rights, we are limited to determining whether the decision of the trial court is supported by competent evidence. Absent an abuse of discretion, an error of law, or insufficient evidentiary support for the trial court's decision, the decree must stand. Where a trial court has granted a petition to involuntarily terminate parental rights, this Court must accord the hearing judge's decision the same deference that we would give to a jury verdict. We must employ a broad, comprehensive review of the record in order to determine whether the trial court's decision is supported by competent evidence.

*In re R.N.J.*, 985 A.2d 273, 276 (Pa.Super.2009), *quoting In Re S.H.*, 879 A.2d 802, 805 (Pa.Super.2005), *appeal denied*, 586 Pa. 751, 892 A.2d 824 (2005). The burden is upon the petitioning person or agency to prove by clear and convincing

evidence that its asserted grounds for seeking the termination of parental rights are valid. *Id.* Moreover, we have explained:

The standard of clear and convincing evidence is defined as testimony that is so "clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitation, of the truth of the precise facts in issue."

*Id., quoting In re J.L.C.*, 837 A.2d 1247, 1251 (Pa.Super.2003). The trial court is free to make all credibility determinations, and may believe all, part, or none of the evidence presented. *In re M.G.*, 855 A.2d 68, 73–74 (Pa.Super.2004). If the findings of the trial court are supported by competent evidence, we will affirm even if the record could also support the opposite result. *In re Adoption of T.B.B.*, 835 A.2d 387, 394 (Pa.Super.2003).

Here, DHS sought termination of Father's parental rights under 23 Pa.C.S.A. § 2511(a)(1), (2), (5), (8) and (b), which provide, in pertinent part:

**§ 2511. Grounds for involuntary termination**

(a) **General rule.**—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

(1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.

---

**2.** We note that Father had listed a third question for our review: "3. Whether the trial court erred because the evidence was overwhelming and undisputed that father, demonstrated a genuine interest and sincere, per-

sistent, and unrelenting effort to maintain a parent-child relationship with his children?" However, this issue has been abandoned as it is not discussed in the argument section of his brief.

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

* * *

(5) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency for a period of at least six months, the conditions which led to the removal or placement of the child continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of time, the services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of the child within a reasonable period of time and termination of the parental rights would best serve the needs and welfare of the child.

* * *

(8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.

(b) **Other considerations.**—The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(1), (2), (5), (8) and (b).

■ Father first argues that DHS failed to prove the statutory grounds for termination pursuant to Section 2511(a). For the purpose of reviewing this issue, we note that this court "need only agree with [the trial court's] decision as to any one subsection in order to affirm the termination of parental rights." *In re B.L.W.,* 843 A.2d 380, 384 (Pa.Super.2004) (*en banc*), *appeal denied,* 581 Pa. 668, 863 A.2d 1141 (2004). Accordingly, we will focus on Father's argument relative to Section 2511(a)(8).

■ When examining Father's claims in relation to Section 2511(a)(8), we are constrained to follow established case law.

Section (a)(8) sets a 12–month time frame for a parent to remedy the conditions that led to the children's removal by the court. Once the 12–month period has been established, the court must next determine whether the conditions that led to the child[ren]'s removal continue to exist, despite the reasonable good faith efforts of DHS supplied over a realistic time period. Termination under Section 2511(a)(8) does not require the court to evaluate a parent's current willingness or ability to remedy the conditions that initially caused placement or

the availability or efficacy of DHS services.

*In re K.Z.S.*, 946 A.2d 753, 759 (Pa.Super.2008).

The first element of Section 2511(a)(8) has been met. The Children had been in DHS care for a period of 24 months from the adjudication of dependency until DHS filed the termination petitions.[3]

 We now examine the second element of Section 2511(a)(8), whether the conditions which led to the Children's placement continue to exist. Initially, the July 29, 2009 general protective services report that led to the Children's placement in foster care alleged medical neglect. From July 29, 2009 to August 21, 2009, DHS conducted several investigations and outreach for the Children's location and status of their health. Both parents were often transient. On August 21, 2009, DHS visited the home where the family lived and found that it was in deplorable condition with no gas or water service. The home was also infested with insects and there was only one mattress in the home that the family slept on together. There was a hole in the floor on the second floor that was open to the kitchen below. The home was cluttered with boxes, clothes and other items. Later that day, DHS learned T.M.T. required eye surgery relating to his congenital glaucoma.

An order for protective custody was obtained and the Children were placed in a CSI foster home. In August of 2009, DHS set up a meeting and Father agreed to the following FSP goals: achieve and maintain recovery from drug and alcohol problems; sign releases of information and medical treatment for the Children; attend scheduled ophthalmology appointments for T.M.T.; obtain and provide adequate and suitable housing; and maintain visitation with the Children. (Notes of testimony, 7/20/12 at 20.) According to the family's assigned DHS social worker, Adrienne Redguard, Father failed to meet any of his FSP objectives. (*Id.* at 22.)

Father failed to take part in the Wedge substance abuse treatment program, and, in fact, tested positive for marijuana every time he rendered a sample. (*Id.* at 49.) Ms. Redguard testified Father was initially consistent with attending medical appointments for T.M.T. (*Id.* at 55.) However, Ms. Redguard testified that the last medical appointment Father attended with the Children was in October 2011. (*Id.* at 54.) Father, in fact, failed to attend T.M.T.'s March 2012 eye surgery or any medical appointments after the surgery.

Ms. Redguard also testified regarding Father's lack of adequate housing for the Children. In December, 2011, Father informed Ms. Redguard that he had located housing. (*Id.* at 35.) However, upon investigation, Ms. Redguard found the housing to be a room in a boarding house located down a hallway and separate from Father's room. (*Id.* at 36.) This arrangement was inadequate and raised serious safety concerns for the Children. (*Id.* at 37.)

Bridget Convey, the foster care social worker for the family, testified that Father attended 10 out of 32 visits with the Children from November, 2011 until the July 20, 2012 hearing. (*Id.* at 68.) Ms. Convey also testified that Father never offered an explanation to her as to why he missed so many visits. (*Id.* at 69.)

We note that Father argues he was enrolled in a drug and alcohol program in prison and completed a parenting program. However, he failed to provide the trial court with any documentation of such.

---

**3.** March 25, 2010 to March 30, 2012.

(*Id.* at 80.) Clearly, DHS has proven the conditions that led to the Children's removal continue to exist despite the reasonable efforts of DHS supplied assistance over the 24 month period.

We now must examine the last element of Section 2511(a)(8), whether termination of Father's parental rights would best serve the needs and welfare of the Children. At the time of the hearing on July 20, 2012, T.M.T. was five years old and N.C.T. was three years old. T.M.T. had been in foster care for three years and N.C.T. had been in foster care for all but six or seven weeks of her life.

At the termination hearing, the Children's foster mother, Vickie Fullwood, testified that the Children began living with her and her husband on March 2, 2012 and the couple was willing to adopt them. (*Id.* at 5, 7.) She described the activities the Children were enrolled in, such as, a track team sponsored by their church, bible study, football and swimming at the Y. (*Id.* at 6.) Mrs. Fullwood stated that T.M.T. was reading at a first grade level. (*Id.* at 8.) She testified she was with T.M.T. for his eye surgery that took place on March 9th. (*Id.* at 10.) She stated she loves the Children and is willing to commit to them. (*Id.* at 11.)

Ms. Redguard, the family's social worker, testified that the Children had been in ten different foster homes before being placed with the Fullwoods. (*Id.* at 43.) She stated the Children are the most comfortable she has ever seen them since living with the Fullwoods. (*Id.*) She further explained:

> [T]hey are definitely doing extremely well. The Ful[l]woods have done everything they need to do to ensure that [T.M.T.]'s sight was where it needs to be. When [T.M.T.] got to the Ful[l]woods, he needed surgery. The foster parents at no time questioned whether or not they needed to take off work to have this done, they were there. The children have flourished since they have been in this home and honestly, I would just hate to see these children continually bounce from home to home at such a young age, when they are in a stable environment in this home.

*Id.*

The trial court opined that Father did not accomplish any of his goals necessary to achieve reunification nor did he reach out to his assigned social worker for help. (Trial court opinion, 11/8/12 at 16.) According to the trial court, Father knew the Children were in placement and was apparently satisfied that his Children's needs were being met by others. (*Id.*) Based on our review of this record, we conclude that the trial court correctly found DHS proved the last element of Section (a)(8) by clear and convincing evidence.

We now examine whether the trial court correctly determined that Father's conduct warrants termination according to Section 2511(b). Pursuant to Section 2511(b), the trial court must engage in an analysis of the best interests of the child by taking into primary consideration the developmental, physical, and emotional needs of the child. *In re Adoption of R.J.S.*, 901 A.2d 502, 508 (Pa.Super.2006). The trial court must consider "intangibles such as love, comfort, security, and stability." *In re C.P.*, 901 A.2d 516, 520 (Pa.Super.2006). To this end, this court has indicated that the trial court "must also discern the nature and status of the parent-child bond, paying close attention to the effect on the child of permanently severing the bond." *In re C.L.G.*, 956 A.2d 999, 1009 (Pa.Super.2008).

Father argues DHS presented minimal evidence as to whether severing the bond between the Children and him would re-

sult in any detrimental harm to the Children. (Father's brief at 13.) Father further argues the agency social worker testified there was a bond but did not explain how severing the bond would affect the Children. (*Id.* at 13–14.)

The record indicates that Ms. Redguard was asked whether she believed the Children would suffer any serious harm if their legal relationship with Father were to end. (Notes of testimony, 7/20/12 at 43–44.) She responded, "No." (*Id.* at 44.) Ms. Convey testified that she supervised two visits between Father and the Children. (*Id.* at 60.) She described the visits as "very interactive," meaning Father acted appropriately playing with the Children and eating snacks. (*Id.* at 61.) Ms. Convey also described what she has witnessed between the Children and the foster parents. She stated T.M.T. regards his foster parents as "mom and dad" and "they are very definitely bonded" and "happy in the home." (*Id.* at 61–62.) As for N.C.T., Ms. Convey stated the child "interacts well with them and she definitely is bonded." (*Id.* at 62.) N.C.T. also calls the foster parents "mom and dad." (*Id.*) Ms. Convey was asked whether she thought the Children would suffer any serious harm if Father's legal relationship with them were to end. (*Id.* at 64–65.) She responded, "No." (*Id.* at 65.)

 Father testified that he loves his Children very much, and Ms. Convey testified on cross-examination that the Children were excited to see him. Father's words, however, are not enough as we have held that a parent's own feelings of love and affection for a child, alone, do not prevent termination of parental rights. *See In re L.M.,* 923 A.2d 505, 512 (Pa.Super.2007). Moreover, while the Children may enjoy eating snacks and having fun time during a supervised visit, this does not rise to the level of a parent-child bond.

The testimony was uncontroverted that the foster parents have a stable, loving and secure relationship with the Children. It is the foster parents who have provided the Children with excellent care and who have committed to their social, emotional, medical and educational needs. We conclude that the trial court did not abuse its discretion in concluding that severing the parent-child bond, if one exists, served the best interest of the Children. *See In re A.R.M.F.,* 837 A.2d 1231, 1240 (Pa.Super.2003) (holding court properly terminated parental rights where decision was based in part on social worker's and caseworker's testimony that children did not share significant bond with biological parents and were well-bonded with their foster parents).

The trial court properly analyzed the factors for termination of Father's parental rights pursuant to Sections 2511(a)(8) and (b). Accordingly, we affirm the orders terminating Father's parental rights to the Children.

Orders affirmed.