J-A07036-14

2015 PA Super 32

| | |
|---|---|
| IN RE: ADOPTION OF: M.R.D. AND T.M.D., MINOR CHILDREN | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: M.C., NATURAL FATHER | No. 1728 MDA 2013 |

Appeal from the Decree dated August 19, 2013
In the Court of Common Pleas of Lycoming County
Orphans' Court at No: 6365

BEFORE:  GANTMAN, P.J., DONOHUE, and STABILE, JJ.

OPINION BY STABILE, J.:                    **FILED FEBRUARY 13, 2015**

Appellant, M.C. (Father), appeals from the decree of the Court of Common Pleas of Lycoming County, Orphans' Court Division (trial court), which granted the petition filed by Appellees, M.D. (Mother) and M.D. (Maternal Grandfather), to involuntarily terminate Father's parental rights to his twin boys, M.R.D. and T.M.D. (Children), pursuant to Section 2511(a)(1) and (b) of the Adoption Act (Act).[1]  For the reasons set forth below, we reverse.

On January 29, 2013, Mother and Maternal Grandfather petitioned the trial court to terminate Father's parental rights.  In their petition, they averred that Father, "for a period of [six] years has evidenced a settled

---

[1] Act of October 15, 1985, P.L. 934, **as amended**, 23 Pa.C.S. §§ 2101-2938.

purpose of relinquishing his parental claims to [Children], and has refused and failed to perform parental duties." Petition to Terminate, 1/29/13, at 7A. Mother and Maternal Grandfather also averred that "the best interests and welfare of [Children] shall be served by the termination of [Father's] parental rights." *Id.* at 7B. They requested that the trial court terminate Father's parental rights to "[a]llow [Maternal Grandfather] to adopt [Children]."[2] *Id.* at 16A. Subsequent to the appointment of a guardian *ad litem* for Children, the trial court held a hearing at which Father, Paternal Grandmother, Mother and Maternal Grandfather testified.

Following the hearing, on August 19, 2013, the trial court issued a decree terminating Father's parental rights to Children. The trial court recognized its obligation first to determine the threshold question of whether the proposed adoption could proceed, as a termination petition filed by one natural parent against the other is only cognizable if adoption of the child is foreseeable. Trial Court Opinion, 8/19/13, at 2. Citing *In re E.M.I.*, 57 A.3d 1278 (Pa. Super. 2012), the trial court acknowledged it simply could not rely upon the averments of the termination petition, but rather had to examine whether termination was in Children's best interests based upon the proposed adoption at the time of termination. Citing *In re Adoption of R.B.F.*, 803 A.2d 1195 (Pa. 2002), the trial court concluded that a non-spouse (an obvious reference here to Maternal Grandfather) could adopt a

---

[2] On February 28, 2013, Mother and Maternal Grandfather filed an amended petition for involuntary termination of parental rights, which largely mirrored their original petition.

child with one parent retaining custody "upon good cause shown".[3] Trial Court Opinion, 8/19/13, at 2. Using **E.M.I.** as a framework for guiding its decision, the trial court viewed the cause standard under Section 2901 of the Act as one requiring it to determine whether Children would be placed in a new parent-child relationship that would foster the creation of a family unit and further the best interests of Children. **Id.** In concluding that Mother demonstrated good cause to permit adoption by the Maternal Grandfather to proceed, the trial court found:

> Mother and Maternal Grandfather have shared parental duties of [Children] since [Children's] birth on October 14, 2004. . . . After leaving the hospital [Children] and Mother returned to [Maternal] Grandfather's home where he took on a regular role in diapering and feeding. [Maternal] Grandfather regularly held [one of the boys] to help him fall asleep. Maternal Grandfather got up with [C]hildren in the night.
>
> [Children] lived at Maternal Grandfather's home until they were 22 months old. Thereafter, Maternal Grandfather provided housing for the boys while they lived in Jersey Shore. Maternal

---

[3] Although the trial court did not provide the citation for the statutory reference for "good cause," we observe that Section 2901 of the Act provides, in part, "[u]nless the court for cause shown determines otherwise, no decree of adoption shall be entered unless the natural parent or parents' rights have been terminated . . . ." **See** 23 Pa.C.S. § 2901. Section 2903 of the Act permits retention of parental rights by a parent when adoption of the child is by the spouse. **See** 23 Pa.C.S. § 2903. Otherwise, Section 2711(d)(1) requires the termination of a living parent's rights in order for adoption of a child under the age of eighteen to proceed. 23 Pa.C.S. § 2711(d)(1). In **R.B.F.**, which decided two cases involving same sex couples wishing to have one partner adopt the other partner's legal children, our Supreme Court held that Section 2901 permitted a petitioner to show cause why in a particular case he or she cannot meet the statutory requirements under the Act. **See R.B.F.**, 803 A.2d at 1201-1202. Upon a showing of cause by clear and convincing evidence that the exception sought clearly outweighs the considerations behind Section 2711(d), a court is afforded discretion to determine if the adoption should nevertheless be granted. **See id.** at 1203. Here, adoption of Children was proposed to be by Maternal Grandfather, a non-spouse.

Grandfather continues to provide significantly for [Children] through groceries and other assistance. Maternal Grandfather has requested certain work hours around his need to be available to pick [Children] up after school. [Maternal] Grandfather has picked [Children] up regularly from daycare, preschool, kindergarten and first grade. [Maternal] Grandfather knows [Children's] interests and participates in their activities[.] This involvement in [Children's] lives has continued and developed at [Children's] various stages from pretending to be pirates to learning football skills. [Maternal] Grandfather stated that [Children] depend on him.

[Maternal] Grandfather has played a regular role in decision making in [Children's] lives. [Maternal] Grandfather attended school conferences and has dealt with discipline issues as a team with Mother. [Maternal] Grandfather has traveled to doctor's appointments with Mother. [Maternal] Grandfather and Mother have co-parented [Children]. [Maternal] Grandfather vacations with [Children]. [Maternal] Grandfather assists in homework. [Maternal] Grandfather has disciplined [Children]. [Maternal] Grandfather attends school functions with [Children]. [Maternal] Grandfather has taken [Children] to his place of employment and regularly along on jobs. [Maternal] Grandfather testified that he "raised" his other children the same way he is raising [Children]. [Maternal] Grandfather has been [Children's] *de facto* father since birth. It is clear from the testimony presented that Maternal Grandfather and Mother together have raised [Children]. [Maternal] Grandfather's role in [Children's] lives extends far beyond the role of a typical grandparent. [Maternal] Grandfather is clearly one half of the parental unit that has raised [Children]. [Maternal] Grandfather's authority, control and influence over [Children] is equal to that of Mother.

Maternal Grandfather has been in the role of parent for [Children] on a nearly daily basis and will continue to do. Maternal Grandfather expressed concern of providing for [Children's] education and financial future. [Maternal] Grandfather's present job as an instructor at Pennsylvania College of Technology will provide free tuition for the boys if they are legally adopted by [Maternal] Grandfather.

*Id.* at 3-5. Based on these facts, the trial court concluded that "[a]doption by Maternal Grandfather in this case would simpl[y] memorialize [the] status quo of [Children's] lives[, *i.e.*,] Maternal Grandfather will continue to raise them as his children." *Id.* at 5.

- 4 -

With the threshold question decided, the trial court next addressed Mother's termination petition under Section 2511(a)(1) and (b), and made the following relevant findings:

1. [Children] were born on October 14th, 2004, in Williamsport, Lycoming County, Pennsylvania. [Children] currently reside with [Mother] [in] Montoursville, Lycoming County, Pennsylvania. [Mother] . . . was born on May 4th, 1979. Mother is currently unmarried. [Maternal Grandfather] . . . was born on April 8th, 1958. He currently resides [in] South Williamsport, Lycoming County, Pennsylvania. Maternal Grandfather is currently married to [M.D.], Maternal Grandmother.

2. . . . [Father] resides [in] Pierre, South Dakota. Mother and Father met while Mother was teaching in South Dakota in 2002.

3. Mother and Father lived together in South Dakota until Mother returned to Pennsylvania in October 2003.

4. Father moved to Pennsylvania briefly in January 2004, but returned to South Dakota.

5. After Father left Pennsylvania, Mother learned of her pregnancy. Mother informed Father of her pregnancy and Mother and Father spoke infrequently throughout the pregnancy.

6. Mother moved into the home of [Maternal Grandfather] during her pregnancy.

 . . . .

9. In October of 2004, Father traveled to Pennsylvania following [Children's] birth for a few days.

10. Father is not [listed] on [Children's] birth certificate.

11. In December of 2004, Father traveled to Pennsylvania to visit [Children]. Father stayed in Maternal Grandfather's home.

12. In January of 2006, Father traveled to Pennsylvania for a visit. Mother planned special experiences between Father and [Children] such as their first haircuts, a professional photo session and shopping trips.

13. In February 2006, Mother discussed with Father she and [Children] traveling to South Dakota to meet [Children's] extended family. Father was not supportive.

14. In approximately August of 2006, Mother moved from Maternal Grandfather's home to . . . Jersey Shore, Pennsylvania. The home was owned by Maternal Grandfather and had previously been a rental property. Maternal Grandfather charged Mother no rent for the home.

15. Father was aware of the address change as evidenced by an envelope sent by Father to [the Jersey Shore address] in December of 2006. The envelope was entered into evidence.

. . . .

17. The parties' communication became extremely infrequent.

18. Mother received the last written correspondence sent by Father in January of 2007.

19. In the Spring of 2007, Father contacted Mother. Mother felt Father was drunk during this phone call.

20. Mother changed her phone number to an unlisted number following the Spring 2007 phone call. Mother's address remained unchanged until 2010. Maternal Grandfather's address remained the same from the time of [Children's] birth until the hearing on August 13th, 2013.

21. At the time of the hearing on the [p]etition for [t]ermination of parental rights, Father had not seen [Children] since January 2006.

22. At the time of the hearing on the [p]etition for [t]ermination of parental rights, Father had not sent [Children] written correspondence since January 2007.

23. Father did not send cards or gifts to [Children] because he was unsure if Mother's address had changed.

24. Father contacted an attorney in 2009 to discuss custody.

25. Father knows how to contact Mother's parents in Pennsylvania. Father had no contact with Mother's parents.

26. Father has provided little support for [Children] during the first few years of their lives. Father sent Mother money on one occasion and bought gifts on his January 2006 visit. Father has provided no further support.

27. Father has sent little more correspondence than six greeting cards to [Children] throughout their lives.

28. In the [sic] November of 2012, Father called and left a voicemail at Mother's place of employment, Williamsport Area School District. Mother did not return Father's phone call.

29. Father filed for custody in December 2012[.] Mother received [n]otice of the proceeding in January 2013.

30. Mother filed her [p]etition for [t]ermination of [p]arental [r]ights on February 5th, 2013.

31. [Children] did not learn of the existence of [Father] until the summer of 2013.

32. Mother informed [Children] of the existence of [Father] due to the pending termination hearing and the fact that [Children] would be speaking with the [g]uardian [a]d [l]item regarding [Father].

33. When Mother, or the [g]uardian [a]d [l]item, discussed Father with the children, they listed either "Pa Pa", Maternal Grandfather or "God" as their father.

34. The children have no bond with Father.

- 6 -

35. Father's intention is to become more involved with the children and form a relationship with the children.

*Id.* at 5-9. Based on the foregoing findings, the trial court concluded that as of the date of the termination petition, "Father has failed to perform his parental duties for a period of time in excess of six (6) months and has evidenced a settled purpose of relinquishing his parental claim." *Id.* at 10. Specifically, the trial court held that "[f]rom the Spring of 2007, to the date of the filing of the [p]etition in February 2013[,] almost six years of the 8-year-old children's life, Father has failed to show even a passive interest in his [Children]," and "Father does not have a bond with [Children]," who embrace only Maternal Grandfather as a "father-figure." *Id.* at 11-12.

Father appealed to this Court. Following Father's filing of a concise statement of errors complained of on appeal, the trial court issued an opinion in accordance with Pa.R.A.P. 1925(a). For its Rule 1925(a) opinion, the trial court relied upon its opinion and order of August 19, 2013, except to correct a typographical error and to address Father's contention that termination of his parental rights was not in the best interest of Children, because Mother and Maternal Grandfather sought only to terminate his parental rights because he filed for custody. In addressing this latter contention, the trial court found:

> Maternal Grandfather testified to adoption being contemplated for years before Father contacted Mother. This testimony was credible. [*See* N.T., 8/13/13, at 16-25.] Maternal Grandfather testified that he had not proceeded with adoption earlier because he "didn't see a need." [*See id.* at 3, 27.] "There was no threat of this happening and then all of a sudden it does . . . ." [*See id.* at 3-4, 27.] In the case at hand, termination of parental

- 7 -

rights only became necessary once Father contacted Mother in 2012. Maternal [G]randfather, Mother and the minor children acted as a family with little involvement from Father from the time of the children's birth on October 14th, 2004. Father had not contacted Mother from Spring 2007 until December 2012. There were no indications from Father that necessitated Maternal Grandfather and Mother formalizing their family through Termination of Parental rights and adoption.

Trial Court Rule 1925(a) Opinion, 10/17/13, at 2. On appeal,[4] Father raises several issues for our review. First, the trial court erred in determining that Mother showed good cause under Section 2901 of the Act to proceed with the adoption when adoption by Maternal Grandfather would

---

[4] The standards governing our review of an order terminating parental rights are well-settled:

> When reviewing an appeal from a decree terminating parental rights, we are limited to determining whether the decision of the trial court is supported by competent evidence. Absent an abuse of discretion, an error of law, or insufficient evidentiary support for the trial court's decision, the decree must stand. Where a trial court has granted a petition to involuntarily terminate parental rights, this Court must accord the hearing judge's decision the same deference that we would give to a jury verdict. We must employ a broad, comprehensive review of the record in order to determine whether the trial court's decision is supported by competent evidence.
>
> The burden is upon the petitioning person or agency to prove by clear and convincing evidence that its asserted grounds for seeking the termination of parental rights are valid. Moreover, we have explained:
>
> > The standard of clear and convincing evidence is defined as testimony that is so 'clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue.'
>
> The trial court is free to make all credibility determinations, and may believe all, part, or none of the evidence presented. If the findings of the trial court are supported by competent evidence, we will affirm even if the record could also support the opposite result.

*In re T.M.T.*, 64 A.3d 1119, 1124 (Pa. Super. 2013) (citations omitted).

- 8 -

not create a new, genuine, parent-child relationship and would not foster the creation of a new family unit. Second, the trial court erred in terminating Father's parental rights under Section 2511(a)(1) based upon its finding Father evidenced a settled purpose of relinquishing his parental rights and failed to perform his parental duties. Lastly, the trial court abused its discretion in terminating Father's parental rights under Section 2511(b) of the Act because there was insufficient evidence to demonstrate that Children's best interest would be advanced by the proposed adoption by Maternal Grandfather.

In support of his first issue, Father relates that Mother moved back home with her family when pregnant and remained there with Children for the first two years of Children's lives. Father's Brief at 15-16. Mother moved with Children to a rental property owned by Maternal Grandparents in August 2006. *Id.* Thereafter, in 2010, Mother and Children moved to their current residence, which Mother is purchasing. *Id.* at 18. Mother pays her mortgage, utilities and other home expenses, but Maternal Grandfather helps financially by providing food on occasion. *Id.* Maternal Grandfather "picks up the slack" by purchasing items like sports equipment for Children. *Id.* Maternal Grandfather and Maternal Grandmother live in an intact relationship in the same household. *Id.* at 24. Father maintains that because Mother and Children live apart from Maternal Grandfather, and Maternal Grandfather lives with and remains married to Maternal

Grandmother, good cause was not established under Section 2901 of the Act, as no new, genuine, parent-child relationship and creation of a new family unit will exist to permit the proposed adoption to proceed.

This Court long has held that the complete and irrevocable termination of parental rights is one of the most serious and severe steps a court can take, carrying with it great emotional impact for the parent and the children. *In re Bowman*, 647 A.2d 217, 218-19 (Pa. Super. 1994), *aff'd by an equally divided court*, 666 A.2d 274 (Pa. 1995). For one parent to petition for the involuntary termination of another parent's paternal rights, the petitioning parent must meet the requirements of Section 2512 of the Act.[5] Under Section 2512, a petition to involuntarily terminate a natural parent's rights filed by an individual (as opposed to an agency) is only cognizable when it is accompanied by a prospective stepparent's intention to adopt the child. *In re Adoption of L.J.B.*, 18 A.3d 1098, 1107 (Pa. 2011)

_____

[5] Section 2512 of the Act provides, in relevant part:

> **(a) Who may file.--**A petition to terminate parental rights with respect to a child under the age of 18 years may be filed by any of the following:
>
> > (1) Either parent when termination is sought with respect to the other parent.
> >
> > . . . .
>
> **(b) Contents.**--The petition shall set forth specifically those grounds and facts alleged as the basis for terminating parental rights. The petition filed under this section shall also contain an averment that the petitioner will assume custody of the child until such time as the child is adopted. If the petitioner is an agency it shall not be required to aver that an adoption is presently contemplated nor that a person with a present intention to adopt exists.

23 Pa.C.S. § 2512.

- 10 -

(plurality); *In re Adoption of J.F.*, 572 A.2d 223, 225 (Pa. Super. 1990) (noting "a parent may not petition to terminate the parental rights of the other parent unless it is established that there is an adoption contemplated by the spouse of the petitioner"). Thus, in a private termination petition, the petitioning parent must identify a qualified person willing and able to adopt the children under Section 2512(b) of the Act if termination of the other parent's rights are to be granted.[6] *E.M.I.*, 57 A.3d at 1287. If a parent files a petition to terminate the other parent's rights to their child or children, involuntary termination is not permitted when no adoption or "new parent-child relationship" is contemplated, because the sole purpose of termination is to further adoption and establish a "new family unit." *L.J.B.*, 18 A.3d at 1108 (noting "where a prospective stepparent, due to separation or pending divorce with the other natural parent, will no longer complete the family unit, the termination of a natural parent's rights due to abandonment must be vacated"). As our Supreme Court explained:

> [T]he legislative purpose behind permitting involuntary termination of parental rights is not to punish an ineffective or negligent parent, or provide a means for changing the surname of the child. Rather, the purpose of involuntary termination of parental rights is to dispense with the need for parental consent to an adoption when, by choice or neglect, a parent has failed to meet the continuing needs of the child. **Once a natural parent's rights are terminated, the concomitant adoption fosters a new parent-child relationship. Such a rule is sound because termination of the natural parent's rights prior to adoption and allowance of stepparent adoption is**

---

[6] A mere averment of a contemplated adoption, however, could "be sufficient to obtain a hearing on the termination petition." *E.M.I.*, 57 A.3d at 1287.

- 11 -

> **for purposes of protecting the integrity and stability of the new family unit.** . . . Thus, where no new parent-child relationship is contemplated, the involuntary termination of parent rights is not permitted under the Adoption Act. (Emphasis added).

*Id.* (internal quotation marks and citation omitted).[7]  In ***In re T.R.***, 465 A.2d 642 (Pa. 1983), our Supreme Court determined that trial courts "should consider, and not merely accept on its face, [the prospective adoptive parent's] and [petitioning biological parent's] Declaration of Intent to Adopt, so that the issue of whether they genuinely seek termination 'solely as an aid to adoption' to thereby establish a new 'parent-child relationship,' the 'singular concern' of the Adoption Act, may properly be determined."  ***Id.*** at 644 n.10.  In fact, the court has stated that "the public policy behind this requirement is simple: Pennsylvania will not countenance state-created orphans."  ***L.J.B.***, 18 A.3d at 1108 n.11.  The court further noted:

> [T]he idea that the state should create orphans is inimical to our family-centered society.  Moreover, the creation of parental termination absent stepparent adoption would provide parents with a new, and in our view dangerous, tactic in heated custody disputes; indeed, one can imagine routine cross-petitions for termination as part of custody battles under the Dissent's suggestion that termination may occur without a ready stepparent.

*Id.* at 1110.  Thus, as here, when a biological parent seeks to terminate the parental rights of the other biological parent, the parent seeking termination must produce a qualified adoptive parent so that the contemplated adoption

---

[7]  It has long been held that the Act is not intended to be used as a sword against a parent.  This point of law originated in a case decided by our Supreme Court in 1977.  ***See In re B.E.***, 377 A.2d 153, 156 (Pa. 1977).

will (1) establish a new parent-child relationship and (2) serve to protect the integrity and stability of a new family unit.

The trial court found that good cause existed under Section 2901 to permit Maternal Grandfather, a non-spouse, to adopt Children before proceeding to terminate Father's parental rights under Section 2511(a)(1) and (b). In so finding, the trial court failed to consider the purpose and necessity behind Section 2512 of the Act. As explained above, a biological parent is permitted only to avail him or herself of the benefits of the involuntary termination provisions of the Act when the proposed termination of the other biological parent's rights would lead to a child's adoption by an individual with whom the child shares a parent-child relationship and the adoption fosters a new family unit for the child. Conspicuously absent from the trial court's decision is a determination that Maternal Grandfather's adoption of Children would create a new family unit. Moreover, our review of the record and the findings made by the trial court reveal no support for such a finding.

First, the trial court found (and it is undisputed by the parties) that Maternal Grandfather is married to Maternal Grandmother. Maternal Grandmother did not testify at the termination hearing, and neither Mother nor Father provided any evidence regarding her relationship with Children or her position with respect to the proposed adoption. Although we cannot speculate about what a record might reveal as to Maternal Grandmother's relationship with Children, the absence of any consideration of this

relationship, given the intact marriage between the maternal grandparents, is disconcerting. We would expect, given the arrangement proposed (Maternal Grandfather as parent to their daughter's children and remaining as spouse to Maternal Grandmother), the impact of a party's other household members would be a part of the determination of whether cause has been shown to permit the proposed adoption to proceed forward.

We find support for this proposition in the related area of custody. When awarding custody, the trial court always must consider the impact of other household members before an award of even partial custody may be made. *See* 23 Pa.C.S. § 5328(a). It is unreasonable to conclude that a trial court must employ a higher level of scrutiny of a person's household in deciding whether to grant the party partial custody of a child than it would when deciding whether to permit the party to adopt a child.

The record also reflects that Maternal Grandfather resides with Maternal Grandmother, while Mother lives alone with Children. There is nothing in the record to suggest that Maternal Grandfather and Mother planned to cohabitate. While this may not necessarily prohibit a finding of the creation of a new family unit, it is a factor to consider. *See, e.g., In re Adoption of J.D.S.*, 763 A.2d 867, 872 (Pa. Super. 2000) ("No gain to the child or society is achieved by permitting the termination of the natural father's parental rights in order to permit adoption by a stepfather who no longer resides with the child's mother.").

Finally, we fail to see how Maternal Grandfather's adoption of Children would create a new family unit, as they are already members of the same family. Unlike in cases of stepparent adoptions or unmarried romantic partner adoptions, wherein the prospective adoptive parent shares no legal relationship with the child, Maternal Grandfather is Children's blood relative.[8] He is their mother's father. Permitting Maternal Grandfather to become Children's adoptive father would not create a new family unit; it would create confusion. To illustrate, Maternal Grandfather would become Children's father. Mother, therefore, would become Children's sister. Although not entirely clear, it appears that this would make Maternal Grandmother Children's stepmother. Furthermore, should Mother choose to remarry, nothing in the Act compels Maternal Grandfather, now father, to terminate his parental rights in favor of Mother's new spouse. Upon remarriage, Children's parents would not be Mother and her spouse, but would remain Mother and Maternal Grandfather, with Mother's new spouse unable to legally form a new family unit.

It is apparent from Maternal Grandfather's uncontradicted testimony that none of these practical ramifications was considered when Mother and Maternal Grandfather decided to file their petition to terminate Father's

---

[8] There is strong public policy against an arrangement whereby a woman's father may be considered the equivalent of a spouse under Pennsylvania law. It is hard to envision that the Legislature intended to permit fathers and their daughters to co-parent when the Marriage Law expressly prohibits a man from marrying his daughter and a woman from marrying her father. *See* 23 Pa.C.S. § 1304(e).

parental rights to Children.  Even though Maternal Grandfather expressed his desire to see his daughter settle down at some point in another relationship, he had not thought about how that would affect his role with Children if he were allowed to adopt them at this time.  N.T, 8/13/13, at 23-26.

Maternal Grandfather's expressed desire for Mother to remarry and the continuing role of Maternal Grandfather as a parent to Children would create unnecessary confusion in Children's lives.  Conflict is inherent in an arrangement where a grandparent with parental rights may choose to parent differently than the married couple with whom the children presumably would be living.

Moreover, we do not believe the Legislature intended such results when it enacted the cause provision under Section 2901 of the Act.  It is one thing to argue and prove by clear and convincing evidence the equivalent of or lack of necessity for a statutory provision where the parties can comply with the purpose of the Act, but not the letter.  ***See R.B.F.***, 803 A.2d at 1203 (remanding for evidentiary hearings to determine whether the appellants, same sex couples who, at the time, were not permitted to marry in Pennsylvania, "can demonstrate by clear and convincing evidence, cause as to whether the **purpose** of Section 2711(d)'s relinquishment of parental rights requirement **will be otherwise fulfilled or is unnecessary** under the particular facts of each case") (emphasis added).  It is quite another thing to eradicate a statutory provision under the guise of cause where both the purpose and the letter of the statute are to be ignored and the exception

allowed to swallow the rule. *See id.* at 1202 (stating that the decision "does not open the door to unlimited adoptions by legally unrelated adults"); *L.J.B.*, 18 A.3d at 1108 (stating that the purpose of an adoption is to "protect[] the integrity and stability of the new family unit"). Although the discretion given to courts under Section 2901 is useful to permit an acceptable substitute for a legislative requirement, this discretion is not so broad as to permit a court to rewrite a statute and entirely upend and redefine the basic purpose of the Act as envisioned by the Legislature.

We also find that Mother's and Maternal Grandfather's reason for filing their involuntary termination and adoption petition does not comport with the purpose of the Act not to use a termination to punish an ineffective or negligent parent. Relying upon Maternal Grandfather's testimony, the trial court found that the principal purpose for the filing of the involuntary termination and adoption petition was to respond to Father seeking custody of Children after a long period of parental non-involvement. Maternal Grandfather testified that he had previously contemplated adopting Children, but did not proceed because he "didn't see a need." N.T., 8/13/13, at 26-27. The "need" only arose once Father filed a petition for custody of Children, which, according to Maternal Grandfather, "threatened [to turn Children's worlds] upside down." *Id.* at 27. Using an involuntary termination petition as a defensive mechanism against a parent seeking custody of his or her children does not comport with the purposes of the

Act.[9] **L.J.B.**, *supra*; **B.E.**, *supra*.   Accordingly, we are compelled to hold that the trial court abused its discretion and erred as a matter of law by concluding cause was demonstrated to permit the adoption of Children by Maternal Grandfather and by considering the petition for involuntary termination of Father's parental rights under Section 2511(a)(1) and (b), as no new family unit was to be created.[10]

In the course of our analysis, we did not find it necessary to address, as a general proposition, whether a maternal grandfather may adopt his daughter's child and serve as a parent to that child with his own daughter. Our holding stops short of this issue because of our conclusion that no new family unit was being created by the proposed adoption in this case.

---

[9]   We disagree with the learned Dissent that we have reweighed the evidence regarding Mother and Maternal Grandfather's motives for filing their petition to terminate Father's parental rights.  We base our observation that the petition did not comport with the purposes of the Act solely upon the trial court's findings in its Rule 1925(a) opinion.  We do not separately characterize this action by Mother and Maternal Grandfather as retaliatory or punitive in a way that is at odds with the trial court's fact-finding.  To the contrary, the trial court's finding that the termination petition was filed as a reaction to Father's custody petition is unequivocal on the face of the trial court's Rule 1925(a) opinion.  Regardless of the adjective attached to the parties' action, it is clear that Mother and Maternal Grandfather's action conflicts with the principle that the termination provisions of the Act are not meant to be used as defensive mechanisms to custody petitions.

[10] We would not take issue with the trial court's findings under Section 2511(a)(1) and (b) if the question of involuntary termination could be reached by the trial court.  Because the trial court erred in finding cause on the threshold question of whether the involuntary petition proposed a termination and adoption to create a new family unit, any consideration of Section 2511(a)(1) and (b) was premature.

Decisions regarding a finding of cause must be made on a case-by-case basis. *See R.B.F.*, 803 A.2d at 1202.

Accordingly, we disagree with the learned Dissent that the decision in *In re Adoption of J.M.*, 991 A.2d 321 (Pa. Super. 2010), compels the opposite conclusion in this case. Like the case at bar, *J.M.* involved a petition filed by the child's mother and maternal grandfather to involuntarily terminate the parental rights of a father and proposing that the maternal grandfather adopt the child. The trial court did not consider the preliminary requirement of whether the mother was able to show cause why she was unable to meet the statutory requirements for the entry of an adoption decree. Rather, the trial court found that the mother was unable to satisfy her burden of proving that termination of the father's parental rights best served the child's needs and welfare pursuant to Section 2511(b) of the Act, as the contemplated adoption by the maternal grandfather "would not create a traditional, nuclear family" and "considered cohabitation the *sine qua non* of the family unit." *Id.* at 325. Relying upon our Supreme Court's decision in *R.B.F.*, the *J.M.* panel found this was error. It did not, as the Dissent suggests, find that "[a] non-spouse adoptive nominee can be a child's maternal grandfather." Dis. Op. at 12. Instead, this Court simply remanded the case to the trial court to give the mother the opportunity "to show cause pursuant to [S]ection 2901 of the Adoption Act why the proposed adoption should not proceed." *J.M.*, 991, A.2d at 327. The panel expressed no opinion either way of whether a grandparent was in fact able to serve as an

adoptive resource for a grandchild when the rights of a parent of that child remained intact.

We also respectfully disagree with the learned Dissent's assertion that, in *J.M.*, this Court expressly rejected the notion that cohabitation was a necessary component of a "new family" unit, and that *J.M.* is both precedential and instructive in this case. The trial court in *J.M.* found that adoption by the maternal grandfather would not create a new family unit given that mother and maternal grandfather maintained separate households since the child's birth and maternal grandfather never maintained physical custody of child. This Court, however, expressly declined to address whether the record supported these findings by the trial court, and hence, whether a new family unit was being created, because this Court felt it necessary first to "confront whether prevailing Pennsylvania law permits Maternal Grandfather to formally step into the void Father created." *J.M.*, 991 A.2d at 325-26. Accordingly, a remand was ordered in *J.M* to permit the petitioners an opportunity to show cause under Section 2901 of the Act why the proposed adoption should proceed. This Court never addressed or resolved the issue whether cohabitation was a necessary component to a new family unit.

Likewise, we do not conclude or state anywhere in our opinion "cohabitation" is *per se* an indispensable element to a "family unit" analysis. There was no need instantly to address that question in light of the totality of facts that support our conclusion. As stated, it is the lack of cohabitation,

or any intent to do so, between Mother and Maternal Grandfather, and Maternal Grandfather's intact marriage to and separate residence with Maternal Grandmother that led us to the legal conclusion that no new family unit was to be created by the proposed adoption in this case.

Nor do we find the Dissent's reference to Section 2312 of the Act to be persuasive. Section 2312 provides the general statement that "[a]ny individual may become an adopting parent." 23 Pa.C.S. § 2312. The Dissent would read this provision as all-encompassing, so as to eradicate all other statutory requirements, in particular, the more specific statutory requirements for adoption under the Act, including the spousal requirement under Section 2903. All provisions of the Act, however, must be read *in pari materia*. **See** 1 Pa. C.S. § 1932(a), (b) ("[S]tatutes are in pari materia when they relate to the same . . . things. . . . [and] shall be construed together, if possible, as one statute."). Furthermore, the Statutory Construction Act makes clear that to the extent two statutory provisions are in conflict and cannot be construed to give effect to both, the more specific provision will control. **See** 1 Pa.C.S. § 1933. Nonetheless, in the same breath the Dissent also acknowledges the "any individual" language under Section 2312 is subject to "good cause shown" under Section 2901 of the Act, thereby contradicting the all-encompassing attribute the Dissent seeks to ascribe to Section 2312 for purposes of this matter.

The Dissent properly acknowledges that a termination petition first must meet threshold requirements under the Act before a court may

proceed to a Section 2511(a) and (b) analysis. The Dissent conducts a Section 2511(a) and (b) analysis even though it expresses agreement with the threshold proposition that the "singular concern" of the Act is to establish a new "parent-child relationship," and that termination of a natural parent's rights and allowance of adoption serves to protect the integrity of the "new family unit" and stability for the adoptee. It is with the preservation of these threshold and fundamental purposes underlying the Act where we part paths with the Dissent.

In closing, we emphasize that we do not today decide anything more beyond our conclusion that the record does not demonstrate by clear and convincing evidence that Maternal Grandfather's proposed adoption of Children will establish a new family unit, a necessary prerequisite in this case to the consideration of the merits of a petition to involuntarily terminate parental rights pursuant to Section 2511(a)(1) and (b). We do not intend to minimize in any manner the substantial contributions and support provided by Maternal Grandfather to his daughter and to his grandchildren. Maternal Grandfather has offered the type of emotional and financial support much needed and often times typical of extended family, especially when one finds a child in need or not fully prepared to address the challenges of having to parent children alone.

We also are fully cognizant of the custody rights possessed by Maternal Grandfather under the Custody Act[11] with respect to his

_____
[11] Act of November 23, 2010, P.L. 1106, 23 Pa.C.S. §§ 5321-5340.

grandchildren. Although termination of parental rights and adoption of Children cannot be sanctioned as proposed in this case, the trial court nonetheless has significant authority and discretion under the Custody Act to enter appropriate custody orders *vis-à-vis* Father and/or Maternal Grandfather in Children's best interests. We, however, do not have the authority to redefine and rewrite the many provisions of the Adoption Act that would be required to grant the termination and adoption sought in this case. Understandably, we reject the Dissent's criticism that our decision is the product of a rigid mindset that ignores evolving societal norms. It is not the role of this Court to establish societal norms. Barring a change in the law by our Legislature or an express reinterpretation of existing statutes by our Supreme Court, we are constrained to reverse, based on an abuse of discretion, the trial court's decree terminating Father's parental rights and approving the adoption of Children by Maternal Grandfather.

Decree reversed. Jurisdiction relinquished.

Judge Donohue joins the Opinion.

President Judge Gantman files a Dissenting Opinion.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 2/13/2015

- 23 -