J-S39030-17

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| IN RE: ADOPTION OF A.C. III, A MINOR CHILD | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: E.A.B., THE NATURAL MOTHER | |
| | No. 246 WDA 2017 |

Appeal from the Decree January 17, 2017
In the Court of Common Pleas of Fayette County
Orphans' Court at No(s): 51 ADOPT 2015

BEFORE:  BENDER, P.J.E., BOWES AND STRASSBURGER,* JJ.

MEMORANDUM BY BOWES, J.:                **FILED AUGUST 7, 2017**

E.A.B. ("Mother") appeals from the January 17, 2017 decree involuntarily terminating her parental rights to her now five-year-old son, A.C. III.  We affirm.

A.C. III was born during March 2012 of Mother's marriage to A.C., Jr. ("Father").[1]  He has two older siblings that were the subject of various child service agencies' involvement with the family.  The siblings also were the

---

[1] The status of Father's parental rights to A.C. III are not clear from the certified record.  While Father did not attend the termination hearing, his counsel appeared and relayed Father's desire to voluntarily relinquish his parental rights.  However, the record does not disclose the status of the relinquishment proceedings.

---

*  Retired Senior Judge assigned to the Superior Court.

victims of sexual abuse, which led to Mother pleading guilty to two counts of endangering the welfare of children. On March 10, 2014, the Fayette County Court of Common Pleas Criminal Division imposed twenty-three months intermediate punishment, with three months house arrest. As a condition of her sentence, Mother was required to participate in sexual offender evaluation and treatment.

At birth, A.C. III tested positive for opiates, and Mother, a recovering heroin addict, tested positive for methadone. The result of Father's drug test was positive for marijuana. The juvenile court temporarily placed A.C. III into emergency custody, but the child was returned to the family after Mother and Father submitted negative drug tests.

At some point subsequent to A.C. III's birth, Mother and Father separated. During April 2014, Mother left A.C. III in Father's extended care; however, Father was unable to care for his son, and Fayette County Child and Youth Services ("CYS") intervened. Then-two-year-old A.C. III was filthy, lacked adequate clothing, and suffered from severe tooth decay. Mother could not be located. Father executed a consent to placement, and on May 15, 2014, the trial court adjudicated A.C. III dependent, and placed A.C. III with O.N. and C.N. (collectively "Foster Parents"), whom he refers to as "mom" and "dad," in what is now his pre-adoptive foster home.

A.C. III's initial permanency goal was reunification. Mother's compliance with CYS's reunification efforts was inconsistent. She attended

seventeen of forty mental health counseling sessions scheduled with Psych-Med Associates in New Castle, Pennsylvania. Only two of Mother's twenty-three absences were excused cancellations. Moreover, Mother did not advise her counselors about the court-ordered focus of her treatment. Instead, she requested medical management and therapy for a previously diagnosed bipolar disorder. Mother eventually abandoned treatment and has not made contact with her counselors since March 11, 2016.

As it relates to visitation with A.C. III, Mother neglected to have any physical contact with her son between April 2014 and January 2015. When she finally did attempt to initiate contact, the supervised visitations were inconsistent. Between January and August 2015, Mother attended fourteen of the thirty weekly visitations. Furthermore, she was resistant to CYS's parenting recommendations and after several visitations that were stressful for A.C. III, the agency transferred supervision to CPP Behavior Health, the facility that was administering A.C. III's behavioral therapy. Again, however, Mother disregarded the supervisors' suggestions. Specifically, Mother ignored the child therapist's explicit recommendation to forego bringing A.C. III unhealthy snacks, referring to herself as "mommy," or initiating physical contact. Mother defied all three imperatives on the first visitation scheduled at the new facility.

Moreover, the supervised visitations continued to be a source of stress for A.C. III. He referred to Mother as "this lady I see" and had previously

articulated his concern that "She [is] going to take me away from mommy and daddy and make me sleep in bunk beds at her house[.]"  N.T., 2/22/16, at 4.  In addition, the therapist observed that following his sustained interactions with Mother, A.C. III's typically calm demeanor would become aggressive "almost to the point of defiant."  *Id*. at 10.

Mother's last visitation with her son occurred on December 30, 2015. On January 8, 2016, she called to cancel visits scheduled for the ensuing two weeks, purportedly due to her preparations for a surgical procedure on January 25, 2016.  Following surgery, Mother failed to attend the next three scheduled visitations, and then on February 18, 2016, she called unexpectedly and requested to visit with A.C. III immediately.  That request was denied.

Meanwhile, on November 23, 2015, CYS filed a petition to terminate Mother's parental rights pursuant to 23 Pa.C.S. § 2511(a)(1), (2), (5) and (8) and (b).  The orphans' court appointed counsel to represent Mother and A.C. III, respectively, and on January 17, 2017, it granted CYS's termination petition.  On the same date, the orphan's court entered an opinion delineating the reason for its decision.  This timely appeal followed, wherein Mother complied with Pa.R.A.P. 1925(a)(2)(i) by filing a concise statement of errors complained of on appeal concomitant with her notice of appeal.

The Rule 1925(b) statement raised one broad issue, which Mother reiterates on appeal as follows:

Did the Trial Court err by abusing its discretion in terminating the natural parent's rights as petitioner failed to sustain its burden of proof by clear and convincing evidence to show that the parent evidenced a settled purpose of relinquishing a settled claim to the child or refused to perform parental duties?

Mother's brief at 6.

This Court reviews the determination of the orphans' court for an abuse of discretion. *In re D.C.D.* 105 A.3d 662, 670-671 (Pa. 2014) ("When reviewing a trial court's decision to grant or deny a termination of parental rights petition, an appellate court should apply an abuse of discretion standard, accepting the findings of fact and credibility determinations if they are supported by the record, and reversing only if the trial court made an error of law or abused its discretion."). This is a highly deferential standard and, to the extent that the record supports the court's decision, we must affirm even though evidence exists that would also support a contrary determination. *In re A.S.*, 11 A.3d 473, 477 (Pa.Super. 2010). CYS has the burden of proving the statutory grounds for termination by clear and convincing evidence. *In re Adoption of L.J.B.*, 18 A.3d 1098 (Pa. 2011).

In termination cases, the burden is upon the petitioner to prove by clear and convincing evidence that the asserted grounds for seeking the termination of parental rights are valid. *In the Interest of T.M.T.*, 64 A.3d 1119, 1124 (Pa.Super. 2013). As noted, CYS invoked the statutory grounds

to terminate Mother's parental rights pursuant to § 2511(a)(1), (2), (5), (8) and (b), which provide as follows.

> **(a) General Rule**.—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> > (1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.
> >
> > (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.
> >
> > . . . .
> >
> > (5) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency for a period of at least six months, the conditions which led to the removal or placement of the child continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of time, the services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of the child within a reasonable period of time and termination of the parental rights would best serve the needs and welfare of the child.
> >
> > . . . .
> >
> > (8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and

termination of parental rights would best serve the needs and welfare of the child.

. . . .

**(b) Other considerations.**--The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511(a)(1), (2), (5), (8) and (b).

Instantly, the orphans' court decree did not specifically identify which statutory basis it relied upon to terminate Mother's parental rights. However, the court's concomitant opinion analyzed CYS's overwhelming evidence in favor of termination in light of subsection (a)(1) and (b). Hence, we review the court's determination in view of the grounds outlined in that provision.

With respect to § 2511(a)(1), this Court has explained,

A court may terminate parental rights under Section 2511(a)(1) where the parent demonstrates a settled purpose to relinquish parental claim to a child or fails to perform parental duties for at least the six months prior to the filing of the termination petition. The court should consider the entire background of the case[.]

*In re A.S.*, *supra* at 482 (citations omitted). While the statute targets the six months immediately preceding the filing of the petition to terminate, the

trial court must consider the entire history of the case and not apply the six-month statutory period mechanically. ***In re K.Z.S.***, 946 A.2d 753, 758 (Pa.Super. 2008).

Accordingly, in order to prevail, CYS was required to produce clear and convincing evidence of Mother's conduct that fulfills either one of the two requirements outlined in § 2511(a)(1). ***In re D.J.S.***, 737 A.2d 283, 285 (Pa.Super. 1999) ("parental rights may be terminated pursuant to Section 2511(a)(1) if the parent either demonstrates a settled purpose of relinquishing parental claim to a child or fails to perform parental duties.") Our Supreme Court has noted that parental duty under § 2511(a)(1) includes "an affirmative duty to love, protect and support" the child and "to make an effort to maintain communication with that child." ***In re Adoption of S.P.***, 47 A.3d 817, 828 (Pa. 2012). When the parent's fulfillment of those duties is made more difficult by impediments, "we must inquire whether the parent has utilized those resources at his or her command . . . in continuing a close relationship with the child." ***Id***.

Once the evidence establishes a failure to perform parental duties or a settled purpose of relinquishing parental rights, the court must then engage in three additional lines of inquiry: (1) the parent's explanation for his or her conduct; (2) the post-abandonment contact between parent and child; and (3) consideration of the effect of termination of parental rights on the child

pursuant to Section 2511(b). *In re Z.S.W.*, 946 A.2d 726, 730 (Pa.Super. 2008).

Mother's argument assails the orphans' court's determination that she failed to perform her parental duties and its implicit finding that she neglected to exercise reasonable efforts to overcome the impediments that she believes that Foster Parents and A.C. III's therapist placed in her way during the supervised visitations. Specifically, she asserts, "The Trial Court Transcript reflects that the Appellant['s] . . . efforts to both see and parent her child were frustrated by both the foster family, and CPP Behavioral Health. (N.T., February 22nd, 2016, at 19 through 21)." Mother's brief at 11. Mother does not challenge the orphans' court's needs and welfare analysis or its determination that no parent-child bond exists between Mother and A.C. III.

After a thorough review of the certified record, the parties' briefs, and the pertinent law, and following our examination of the opinion authored by the distinguished Nancy D. Vernon, we find that she has ably distilled CYS's evidence in favor of terminating Mother's parental rights pursuant to 2511(a) and (b), addressed the relevant issues, and performed the necessary needs-and-welfare analysis. We adopt her reasoning as our own. Accordingly, we affirm on the basis of her well-reasoned opinion dated January 17, 2017.

Decree affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: <u>8/7/2017</u>

IN THE COURT OF COMMON PLEAS OF FAYETTE COUNTY, PENNSYLVANIA

ORPHANS' COURT DIVISION

FILED
01/18/2017 10:06:56 AM
REGISTER OF WILLS
FAYETTE COUNTY
PENNSYLVANIA
Inst Num:     201700547

IN RE:                                    :

ADOPTION OF A.C. III            :        NO. 51-ADOPT-2015

VERNON, J.

## OPINION

A.C. is a young male child aged 4 years 10 months and born March 4, 2012. A.C. has been in the same foster placement since April of 2014, a family which stands ready to provide a permanent home and to adopt A.C.

Fayette County Children and Youth Services (hereinafter referred to as the "Agency") became involved with the biological family prior to the birth of A.C. The biological mother of A.C. is E                                  (hereinafter referred to as "Mother"). The biological father of A.C. is A        C     (hereinafter referred to as "Father").

The Agency's first involvement with the parents came about when the child's older siblings from Lawrence County were placed with relatives in Fayette County in 2006. The issues surrounding the parents at that time were the use of drugs and alcohol, domestic violence and general neglect. The Agency assisted Mother in a family service plan in which Mother did not successfully complete and the children were discharged into the custody of the caregivers. That case lasted from 2006 until 2012

ITEM NO. 13

when it was ultimately closed. There were allegations of sexual conduct by Mother while the children were in her care which resulted in criminal charges. Mother plead no contest to Child Endangerment and was sentenced on March 10, 2014 in Fayette County to a term of Intermediate Punishment of 23 months with 3 months electronic monitoring and sexual offender treatment. (Petitioner's Exhibit 7- T. at 107).

Ms. Christy Shaw, the Permanent Program Specialist of Fayette County Children and Youth, additionally gave the history of Agency involvement of A.C., the subject of the within action.

At birth, A.C. tested positive for opiates and was placed in foster care after discharge from the hospital. Mother tested positive for methadone and Father for marijuana.

After the parents obtained housing and were testing negative for drugs, this child was returned to parents. On April 21, 2014, Father brought the child to his mother, the paternal grandmother because he was going to prison and could not care for A.C. The paternal grandmother was unable to care for A.C. and contacted the former foster parent, Cl U. The U immediately contacted the Agency to report the child had been brought to them. The U foster home was full and A.C. was placed with another licensed foster family that the U were mentoring. That is where A.C. remains. He also continues to have significant contact with his grandmother who visits as a normal grandmother at the home.

When placed in care in April of 2014, Ms. Shaw testified that the child had one of the worst cases of severe tooth decay they had ever seen. He was very dirty and

2

poorly dressed. C⟩ U⟩ informed the Agency that upon receiving A.C., grandmother and Father informed her that Mother's whereabouts were unknown. From April 21, 2014 until January of 2015, the Agency had no contact with Mother.

After the sentencing in March of 2014, Mother returned to Lawrence County to serve house arrest. She had also re-entered the Amish Community. Mother claims that is why the Agency could not find her. Mother claims that she was contacted by her Probation Office in March of 2014 and told she could not have A.C. with her under the terms of her supervision. This is not a credible statement since Lawrence County was only supervising from Fayette County and there is no Megan's Law required on the sentencing Order. However, in any event, Mother went to friends with A.C. to contact Father to pick him up. At this time, Mother and Father were not living together.

Father took the child to his mother and subsequently to the U⟩ foster home on April 21, 2014. Father signed a Voluntary Consent for Placement on April 24, 2014. Throughout the years of the CYS case, Father has indicated his desire to voluntary terminate his parental rights in order to allow the⟩ to adopt A.C. and give him a full life. Father did not appear at any of the latter two days of hearings although he had received notice as to the time and date of the proceedings and was represented by Southwest Pennsylvania Legal Services' attorney, John Perrott.

Although ordered pursuant to sentence to attend counseling with a special emphasis on sexual offender treatment, Mother did attend counseling at Psych-Med Associates with mental health therapist/counselor, Abbie Flinner, on December 19, 2014 in New Castle Pennsylvania. Mother did not inform the therapist as to the type of

3

counseling ordered. Ms. Flinner testified that she saw Mother from December 19, 2014 until March 11, 2016 and has not seen her since. (T. at 10-12). Mother had been diagnosed previously for bipolar disorder and desired medical management and therapy. Mother complained of Post-Traumatic Stress dealing with the loss of custody of two children. The therapist testified that Mother made growth in talking about past trauma, her marriage and overall coping. (T. at 39).

The progress notes of four appointments with Ms. Flinner dated 2/13/15, 5/1/15, 5/4/15 and 5/15/15, Petitioner's Exhibit 2, all reflect a diagnosis of Bipolar 1 and note that at each visit the patient's "irrational ideas were also confronted and reflected and an investigation of the patterns of certain behaviors." (Exhibit 2). Since December of 2014, forty (40) appointments were scheduled. Mother had twenty-one (21) no shows and two (2) cancellations. There is no evidence presented that Mother continues in therapy. Mother feels her sentence is finished, however, the Clerk of Courts' representative affirmed that it is still open for failure to complete payment. When confronted with this in the Clerk of Courts' Office the morning of this hearing, Mother claimed not to know about the payments because she was "Amish."[1] (T. at 203).

There was no expert produced as to the emotional fitness of Mother to be a parent to A.C.

The Caseworker of the CYS Agency assigned to A.C.'s case from April 14, 2014 to November of 2015 was Maria Riddell. Riddell testified that she worked with

---

[1] Mother claims throughout that she did not contact CYS or see her child due to Amish influences which will be discussed later in this Opinion.

4

Mother and Father towards reunification. The family service plan with Mother was entered into in January of 2015. Prior to that time from April of 2014, she attempted to contact Mother. The phone was disconnected and there was no address.

A.C. was adjudicated a dependent child on May 15, 2014. Mother's first visit was January 30, 2015. From January of 2015 until August 20, 2015, there were thirty (30) visits scheduled with A.C. Mother made only fourteen (14), less than half. Mother would always miss the visits due to medical appointments which she scheduled that conflicted with visitation times. Her address would change from Lawrence to Mercer County. Mother moved twice. (T. at 49-51).

Riddell testified, as was later supported by the testimony of the expert bonding psychologist, that the visits with A.C. and Mother were quiet. Mother would hold a drink and not let A.C. have it until he told her he loved her. (T. at 50). The foster parents reported that after visits, A.C. would act up, defecate in his pants and experience night terror. (T. at 51). This behavior continued until this Court suspended visitation.

When the case started, Father had just been incarcerated, having received A.C. from Mother the month before. Ms. Riddell said A.C. had severe tooth decay, was dirty and scared. (T. at 52). Father took the child to the foster parents with whom he had a former relationship. Father signed a Voluntary Placement on April 21, 2014. Father failed most of the family service plan by being unsuccessfully discharged from Drug and Alcohol treatment, having no housing, no employment and visiting infrequently missing most visits until he stopped visiting altogether. (T. at 55). Father was to have regular mental health treatment but he was discharged for non-compliance.

5

At Father's first visit on May 12, 2014, he stated he did not want to visit anymore and wanted the _____ to adopt A.C. (T. at 51). Father had no further contact until February of 2015 because he had heard Mother was working on her family service plan and he did not want her to have A.C. Father, however, never followed through. The last visit with his child was August 12, 2015.

Ms. Riddell testified that A.C. is very comfortable with his foster family and is very affectionate towards them in contrast to the aloofness he exhibited to Mother, never once calling her mom or mommy. (T. at 62).

Ms. Carol Patterson was called to testify and recognized by the Court as an expert in the field of bonding assessment. Patterson is a Licensed Psychologist since 1979. She has testified hundreds of times as an expert in the field of psychological evaluations, custody evaluations and bonding assessments. Patterson met with the foster parents on September 21, 2015 and Mother on September 24, 2015. She also observed the child with each foster parent and Mother. Father cancelled.

Foster father, _____, informed Patterson that the child had been with them since April of 2014 and that the visits with Mother starting in early 2015 were fairly inconsistent. A.C.'s visits were changed to therapeutic intervention at CPP Behavioral Health (T. at 84-85).

Ms. Patterson observed A.C. include his foster family in all play activities. A.C. was happy, smiling and pleasant. He was affectionate and had no behavioral issues. A.C. refers to the _____ as mom and dad. The _____ were affectionate to A.C., provided structure, gave him tasks, provided for his needs and provided age appropriate

toys and activities. (T. at 87). Patterson opined that A.C. and foster parents enjoy a positive relationship. (T. at 87).

Ms. Patterson interviewed Mother. Patterson noted her observations of the interaction of A.C. and Mother. A.C. exhibited a variable mood. He showed oppositional aggressiveness to Mother. A.C. hit her a couple times and knocked down blocks she had made and destroyed a house Mother built. He played independently from Mother. A.C. either failed to respond or responded negatively toward her approaches. A.C. did not initiate affection and did not return affectionate behavior. He did not refer to her in any manner. (T. at 92).

Mother was observed by Patterson to attempt affection and be happy while the child remained anxious with short levels of concentration. He made circles around her rather than interacting. When the visit was over, A.C. was ready to go and went out the door. (T. at 92).

Carol Patterson's conclusions based upon a reasonable degree of psychological and bonding certainty were that A.C. has no bond or attachment with his Mother and he has a strong bond and attachment with his foster family. (T. at 94). She further opines that A.C. will suffer no psychological harm if the rights of the natural parents are terminated. However, if the bond was severed with his foster parents, he would suffer adverse consequences. (T. at 94). The bonding process is critical at three and four years and disruption would negatively affect his ability to form bonds later on in life. (T. at 97).

7

In February of 2015 after stressful visits with A.C., the visits were changed to CPP Behavioral Health and observed by Kellie Mikluscak, a behavioral health therapist of twenty-two years, certified in trauma therapy. (T. 2/22/16 at 3). Beginning September 3, 2015, Mikluscak observed the visitation with Mother for close to a year. Only one time did the child refer to Mother and that was "this lady I see, she is going to take me away from my mommy and make me sleep in bunk beds at her house." (T. 2/22/16 at 4).

In play therapy, Mikluscak testified that monster trucks would bring fear to him. (T. 2/22/16 at 6). Playground equipment would bring fear. A.C. had a fear of biological Mother and Father and he calls O( and Cl mom and dad. (T. 2/22/16 at 7). The foster home is his happy, calming spot. (T. 2/22/16 at 8).

Ms. Mikluscak advised Mother not to bring snacks or call herself mommy during visits. She would not cooperate. Mother brought food and urged the child to "give mommy hugs and kisses." He would say, "No." (T. 2/22/16 at 9).

When visits were consistent, A.C. would behave upset afterward and be defiant. His behavior would completely change from sweet and loving to defiant. (T. 2/22/16 at 10). Wanting reassurance when leaving his foster family in the waiting room, the child would always ask, "Mommy, Daddy, you come back and pick me up, right?" (T. 2/22/16 at 11).

Therapist Mikluscak opined that A.C. is right where he needs to be developmentally, cognitively, socially and mentally and that he is so successful due to his thriving environment. (T. 2/22/16 at 16).

8

As shown in play therapy, A.C. is scared of being taken away from his "mommy and daddy" (foster family). There is no observed connection with Mother. This is the opinion of an expert who not only is a licensed trauma therapist but has an Early Childhood degree and Master's Degree in Special Ed and Emotional Support, has twenty-three years' experience with children and is an expert in Early Childhood Therapy. (T. 2/22/16 at 28).

Mother testified that it was true she never made an attempt to see A.C. from March of 2014 until January of 2015, a period of nine (9) months. She testified, however, that she did have open contact with him and the M        from April 2014 until January 2015. Her testimony is fraught with inconsistencies. Given her mental condition and noted irrational ideas, it is difficult for this Court to find that she is in any way a credible witness.

This Court realizes it has taken time to render a thoughtful, detailed, analyzed Opinion. There was a several month gap in the testimony due to one of the counsel's serious medical condition, two separate transcripts and three days of testimony have been transcribed and studied. The importance of this decision in the life of this child cannot be underestimated. The Court has presided over the dependency matter and termination. Anticipating that Mother will see this matter as she wants to see it, rather than its reality, this Opinion provides abundant detail in completely quoting testimony as well as citing inaccuracies, inconsistencies and confusing statements. This decision does not change where this small happy child lives, whom he loves, nor whom he considers his parents. To preserve this decision and the findings of this Court, the Court viewed

9

this matter as one in which justice could only be achieved for A.C. after much analytical thought, legal review and analysis.

E‍J B‍f biological Mother of A.C., has been living at ‍\Fredonia Road, ‍{ ‍. ‍| in Mercer County since June 9, 2015. In January of 2015, she was living with the Amish in New Wilmington. B‍; was born on November 15, 1983. She was raised in the Amish community until she left at age 17 in search of her mother. She remained out of the Amish community from 2000 until 2013. In 2013, she lived with the Amish until March of 2015. In the past fifteen (15) years, she has been with the Amish community for only two (2) years. Mother was addicted to drugs and started rehab at twenty (20) years of age. She got "hooked on drugs after she had children with the kids' dad." (T. at 123). Eight years ago, she was involved in a serious automobile accident and took OxyContin and for seven years, methadone.

Mother was monitored by the probation office of Lawrence County. She alleges that she was not permitted to be around children due to her sentence on Endangering the Welfare of Children. No one testified that there was such a requirement, nor was it part of the sentence of record. If she was informed of such a requirement, would not one question its legitimacy since there was no Megan's Law finding? In any event, Mother gave A.C. to Father. Mother called Father and his mother on Easter of 2014 and allegedly was told that the child was at the M‍ or was in unknown foster care or that her rights were terminated. This is where Mother's testimony goes in different paths and is confusing. On the one hand, Mother testifies that in the Amish community, "What the man says, the woman has to do and you cannot say yes or no, you

10

just got to do it. It doesn't matter what it is." (T. at 130). Because of this mental control, she had no contact with A.C. Yet, later in her testimony, she said that she knew the child was with the M           and had regular communication with the child including pictures, screenshots, goodnight calls and daily updates.

As to the Amish preachers telling her that A.C. was not in the community and Mother believing she was not to have contact because a man told her that her rights were terminated, the Court deems this testimony absurd. She was out of the Amish community from age seventeen (17) until around the age of thirty (30). She married outside the community and divorced. She was addicted to drugs. The man allegedly telling her that her parental rights were terminated was A.C.'s father and he was not Amish. Mother had certainly gone against Amish tenets over numerous years. In 2015, her husband      and she left once again. To profess that Amish male preachers dominated and controlled her mind is not credible.

Next, Mother claims she had been speaking to the Mt           from April of 2014 until January of 2015. She was receiving screenshots, updates, while the foster family begged her to "Let us keep him. Let us adopt him. Don't get CYS involved." (T. at 152). The Solicitor for the Agency questioned:

Q.    You're saying that from April 2014 until January 2015, you

knew the\       ¹'s had your child?

A.    Uh-huh.

Q.    You knew they had the child through CYS?  (T. at 154).

A.    Yes. (T. at 154).

11

Q. Yet you never contacted CYS?

A. Because I was dealing with them. I was able to talk to them anytime I wanted to. I didn't need CYS to tell me. That's exactly what they told me, leave CYS out of it. (T. at 154).

Mother responded, "I was very satisfied with the M· and leaving CYS out of it because I didn't have everything together that I needed for a child at that time." (T. at 155). Mother claims to have been able to see A.C. or talk to him anytime she wanted. (T. at 155). "They were letting me do whatever I wanted." (T. at 156).

Mother gave many excuses for not visiting A.C. including distance, money, a babysitting job and medical appointments that she scheduled even though she knew the dates of visits. She went on to state she doesn't work, but "I work so hard around the house everyday it's not funny. One hundred dollars a week to see "this child" when I come." (T. at 167). There is no rationality in these excuses.

A.C. was received by the Agency with extreme dental decay at two (2) years of age. Mother acknowledged his teeth were bad thinking it was normal since she, her mother and sisters all had bad teeth when young. The Agency arranged for dental care immediately and it was neglectful of Mother not to have helped this child in March of 2014. Mother stated, "They said he was too young. My whole family's teeth rot away faster than a normal child's would." (T. at 173). These comments are incomprehensible and illustrate the irrational thoughts that counselor Flinner recognized.

After Mother testified in vivid detail that she was informed at Easter 2014 that the M· had A.C., she proceeded to acquire a phone number from A.C.'s

12

grandfather. "I messaged daily, telling me how he's doing, letting me say goodnight, gave me a report pretty much daily and also the father." (T. at 178). The Court asked, "Did you ask the M( , hey, how do you have my child, are my rights terminated?, to which Mother responded, "It was a private thing with me and the M ." (T. at 179). When asked by the Court if the M ; were begging you not to take the baby from them, how would you possibly be able to take the baby if your rights were terminated? Her answer, "You know what, I didn't." (T. at 179). The above is an example of the illogical, confused testimony of Mother.

The very next day of hearing, Mother took the stand to totally recant this detailed testimony of her involvement with the M She now testified that she had no communication with the M ; and that Father had sent her screenshots of his visits. (T. at 183). She again reiterated that the Father told her A.C. was put in foster care. Earlier she claimed that she had no idea where A.C. was located. The prior day she testified in great detail that she knew A.C. was with the M. and kept in constant contact with them. These three statements are blatant contradictions.

In fact, Mother said, "Preachers told me to back off since the kids were outsiders" in March of 2014 until January of 2015. However, she also stated that she was "looking to find out this whole time what happened to my child." (T. at 187). Was she intentionally backing off from finding A.C. or was she looking the entire time to see what happened to her child? She said both. Did she know where he was and had contact with A.C. and his caregivers? All three versions were testified to at different points by Mother. Her testimony is impossible to follow in any sensible manner.

13

The Court holds that Mother gave Father A.C. and was content. Mother never made an attempt to see him in any fashion for over nine (9) months. The child was neglected and suffered from extreme dental decay and neglect. The child was, and is, fearful of both parents and afraid to be pulled away from the only people he knows as parents. To sever this bond and force him to live with Mother would cause irreparable damage.

The Court further holds that Mother is suffering from untreated Bipolar I disorder and maintains irrational thoughts as evidenced by her inconsistent testimony. She neglected A.C.'s medical needs and abandoned him for over nine (9) months. A.C.'s best interests do not promote a return to either of these parents.

The termination petition filed pursuant to 23 Pa.C.S.A. §2511(1), (2), (5) and (8) alleged the following:

> (A) **General Rule** - The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> (1) The parent by conduct continuing for a period of at least six (6) months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.
>
> (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for the child's psychological or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.
>
> . . .

14

(5) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency for a period of at least six months, the conditions which led to the removal or placement of the child continued to exist, the parent cannot or will not remedy the conditions which led to the removal or placement of the child within a reasonable period of time and termination of the parental rights would best serve the needs and welfare of the child.

. . .

(8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, twelve months or more have elapsed from the date of removal or placement, the conditions which led to the voluntary removal or placement of the child continues to exist and termination of the parental rights would best serve the needs and welfare of the child.

23 Pa.C.S.A. §2511(1), (2), (5) and (8).

The burden of proof in actions to terminate parental rights is upon the party seeking termination to establish by "clear and convincing" evidence the existence of grounds for doing so. *In Re: Adoption of A.C.H.*, 803 A.2d 224 (Pa. Super. 2002). Above all else, adequate consideration must be given to the needs and welfare of the child. The standard of clear and convincing evidence means testimony that is so clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitation, the truth of the precise facts at issue. Evidence of mother's inability to care for her daughter and the child's best interests being serviced in another environment were sufficient to support termination. *Appeal of L.L.S., natural mother*, 787 A.2d 1007, 2001 Pa.Super. 341 (2001).

In this case, mother and father have been given years to prove they can be a capable parent and they have failed in every respect. Once evidence establishes a failure

15

to perform parental duties or a settled purpose to relinquish parental rights, the Court must engage in three lines of inquiry: (1) the parent's explanation for his or her conduct; (2) the post abandonment contact between parent and child; and (3) the effect of termination of parental rights on the child pursuant Section 2511(b). *In Re: Adoption of Godzak*, 719 A.2d 365 Pa.Super. (1988).

Both parents have failed to provide for the needs of this child and A.C. is no longer bonded to them. It is by the clear and convincing evidence presented that this Court decrees that the parental rights of each parent are terminated. The best interest of A.C. is protected by this termination.

BY THE COURT:

_____ J.
NANCY D. VERNON, JUDGE

ATTEST:

_____
REGISTER OF WILLS

FILED REGISTER OF WILLS
2017 JAN 17 PM 2

16

IN THE COURT OF COMMON PLEAS OF FAYETTE COUNTY, PENNSYLVANIA

ORPHANS' COURT

\*\*\*\*

IN RE: ARTHUR CHILDS, III

File No. 51-ADOPT-2015

## AFFIDAVIT OF SERVICE

I do hereby certify that I, Janice Cooper, Clerk, mailed a copy of the ORDER OF COURT dated January 17th 2017, by first class mail to the following:

Anthony S Dedola, Jr., Atty.
Ewing D Newcomer, Atty.
Kimberly Kovach, Atty,.
Vincent Tiberi, Atty.
John Perrott, Atty.

Fayette County Children and Youth Services
Elizabeth Byler Mason a/k/a Elizabeth Childs
Arthur Childs Jr

Jeffrey L. Redman, Register of Wills
County Courthouse
61 East Main Street
Uniontown, PA 15401

Date: January 18, 2017

_____
Clerk of the Orphans Court Division