J-S03029-20

NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37

| | | |
|---|---|---|
| IN THE INTEREST OF: S.K.B., A MINOR | : : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: S.B., BIRTH MOTHER | : : : : : : : | |
| | : | No. 1401 WDA 2019 |

Appeal from the Order Entered August 14, 2019
In the Court of Common Pleas of Allegheny County Orphans' Court at
No(s):  CP-02-AP-149-2018

BEFORE:   McLAUGHLIN, J., McCAFFERY, J., and PELLEGRINI, J.[*]

MEMORANDUM BY McCAFFERY, J.:                    FILED FEBRUARY 26, 2020

S.B. (Mother) appeals from the order entered in the Allegheny County Orphans' Court involuntarily terminating her parental rights to her son, S.K.B. (Child).  Mother contends the Orphans' Court abused its discretion or erred as a matter of law when it terminated her parental rights to Child pursuant to 23 Pa.C.S. § 2511(a)(2), (5), (8), and (b).  For the reasons below, we affirm.

On September 19, 2016, Child was born prematurely to Mother, who was, herself, a dependent child.  At the time, Mother was 17 years old[1] and living at the Ward Home, a supervised independent living program, with her

_____

[*] Retired Senior Judge assigned to the Superior Court.

[1] Mother was born in November of 1998.  Allegheny County Office of Children, Youth and Families (CYF) had been involved with Mother since she was 11 years old.  N.T., 5/16/19, at 19.

older child, who was born in July of 2015.[2] See CYF Exhibit 5. As a result of his premature birth, Child suffered several health issues, which were described by his primary care physician, Dr. Stacey Cook, as follows:

> [H]e had gastroeophageal reflux so we think that he had some stomach contents that regularly kind of were regurgitated. He also had . . . tracheomalacia which is a common situation that we see especially in premies where the tissues surrounding the airways are a little bit weak. And he actually had a laryngeal cleft that that was repaired in January of 2017 by [ear], nose and throat doctors. Then he had severe respiratory infections with common [respiratory syncytial virus (RSV)] and adenovirus.

N.T., 5/16/19, at 139. Child had difficulty gaining weight, and "cannot be around any kind of smoke . . . perfume, dyes, paraffins, anything like that because it triggers his respiratory issues." Id. at 75, 125, 154; N.T., 5/30/19, at 21-22. Child also has the sickle cell trait and a heart murmur. Order of Adjudication & Disposition, 2/16/17, at 2. Dr. Cook explained that Child will continue to require "close following especially during respiratory viral season" over the next several years, due to his "severe and extreme" response to "seemingly common infections." N.T., 5/16/19, at 145-46, 156.

After his birth, Child remained hospitalized almost three months, until he was released to Mother's care on December 13, 2016. On December 22, 2016, Mother took Child to a medical appointment, at which time the doctor recommended she take Child to the hospital because his failure to gain weight was "life-threatening." N.T., 5/16/19, at 26. Mother refused to do so, and

_____

[2] Mother's older child remains in her care, and was not involved in these termination proceedings.

left the doctor's office with Child. Allegheny County Office of Children, Youth and Families (CYF) then applied for an Emergency Custody Authorization (ECA). However, after a CYF supervisor contacted her, Mother took Child to the hospital and the ECA expired. Id. at 27. Child was hospitalized for four days, and discharged to Mother.

Child was once again hospitalized on January 17, 2017, when he required a "medical procedure . . . due to his poor weight gain." N.T., 5/16/19, at 28. CYF caseworker, Daneyia Lewis, testified:

> Mother was not in agreement with the procedure being done because she was denied access into the medical room where he was having this done. At that time [M]other removed the IVs from [Child] and attempted to leave the hospital without proper discharge instructions.

Id. The next day, CYF obtained an ECA, took Child into its custody, and took him to the hospital. Following a shelter care hearing on January 20, 2017, the Orphans' Court ordered Child be placed in foster care upon his discharge from the hospital. When Child was discharged on January 22, 2017, he was placed in a "medically specialized" foster home where he remains to this day. Id. at 33-34.

CYF filed a dependency petition on February 1, 2017. Following a hearing on February 16, 2017, the Orphans' Court adjudicated Child dependent. Mother's goals for reunification with Child were related to her

mental health, drug, and alcohol issues,[3] lack of stable housing, and parenting deficiencies, particularly with regard to Child's medical needs.  N.T., 5/16/19, at 40, 58, 69-70.  Although Mother initially obtained treatment for her mental health and drug and alcohol issues, she stopped mental health treatment by September of 2017, and drug and alcohol treatment by December of 2017.[4] Id. at 46, 50-51.  In February of 2018, Mother was able to secure housing through Family Links ARIA.  Id. at 43; Permanency Review Order, 2/21/18, at 3.  Moreover, Mother successfully completed a parenting program between October of 2017 and March of 2018, at which time she was approved for unsupervised visits at her home.  N.T., 5/16/19, at 57, 61, 64.  However, a visit scheduled for March 20, 2018, was cancelled when a CYF caseworker smelled marijuana in the home.[5]  Id. at 65.

Following a June 20, 2018, permanency review hearing, Mother had "a complete breakdown in the courthouse" and refused to give Child back to his

_____

[3] With regard to Mother's mental health, CYF Caseworker Lewis explained the agency was concerned because Mother was a dependent child herself, with another small child, and Mother "expressed oppositional and aggressive behavior with [the agency] throughout the time she was with [it] as a parent." N.T., 5/19/19, at 49.  Ms. Lewis also testified that Mother had been involved in drug and alcohol services "on and off since she was a child."  Id. at 45.

[4] From February of 2017, through December of 2018, Mother failed to appear for 18 of 37 random urine screens.  N.T., 5/19/19, at 48.

[5] The court's April 18, 2018, Permanency Review Order reveals Mother admitted she had relapsed with regard to her marijuana use.  Permanency Review Order, 4/18/18, at 3.  The court further described Mother as "overwhelmed and frustrated [and] appears to be self[-]medicating with marijuana."  Id.

foster mother for "about 45 minutes" until the sheriff intervened. N.T., 5/9/19, at 53-54. The Orphans' Court noted it was "very concerned about [Mother's] stability[, and] her capacity to parent [Child] with all of his medical complications." Permanency Review Order, 6/20/2018, at 3.

Thereafter, on July 26, 2018, CYF filed a petition seeking the involuntary termination of Mother's parental rights to Child. The Orphans' Court conducted three termination hearings on May 19, May 30, and August 12, 2019. At the conclusion of the August 12, 2019, hearing, the court entered an order granting CYF's petition, and awarding custody of Child to CYF. Mother filed this timely appeal, along with a statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925.[6] See Pa.R.A.P. 1925(a)(2)(i) (requiring appellant to file statement with notice of appeal when case involves children's fast track appeal).

Mother raises the following two questions on appeal:

1. Did the [Orphans' Court] abuse its discretion and/or err as a matter of law in granting the petition to involuntarily terminate Mother's parental rights pursuant to 23 Pa.C.S. § 2511(a)(2), (5), and (8)?

2. Did the trial court abuse its discretion and/or err as a matter

_____

[6] We note Child's birth certificate does not name Child's father, and Mother has refused to disclose the name of the father to the Orphans' Court. CYF's Petition for Involuntary Termination of Parental Rights, 7/26/18, at ¶ 4. Mother did name two putative fathers in various court filings; however, she was unable to provide any identifying information regarding one, and the other was excluded via paternity testing. Id. at 4, n.2. Nevertheless, CYF also sought to terminate the parental rights of the putative father(s). Id. The court granted this termination, and no putative father has appealed the order.

of law in concluding that CYF met its burden of proving by clear and convincing evidence that termination of Mother's parental rights would best serve the needs and welfare of [Child] pursuant to 23 Pa.C.S. § 2511(b)?

Mother's Brief at 6.

Our standard of review of an order involuntarily terminating parental rights is well-established:

> The standard of review in termination of parental rights cases requires appellate courts "to accept the findings of fact and credibility determinations of the trial court if they are supported by the record." In re Adoption of S.P., 47 A.3d 817, 826 (Pa. 2012). "If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion." Id. "[A] decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will." Id. The trial court's decision, however, should not be reversed merely because the record would support a different result. Id. at 827. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings. See In re R.J.T., 9 A.3d [1179, 1190 (Pa. 2010)].

In re T.S.M., 71 A.3d 251, 267 (Pa. 2013).

Section 2511 of the Adoption Act governs the involuntary termination of parental rights. See 23 Pa.C.S. § 2511. "Our case law has made clear that under Section 2511, the court must engage in a bifurcated process prior to terminating parental rights." In re Adoption of R.J.S., 901 A.2d 502, 508 (Pa. Super. 2006). First, under subsection (a), "the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a)." Id. Only if the court finds

termination is warranted under subsection(a), must it then consider whether termination would best serve the needs and welfare of the child under subsection (b). Id.

In the present case, the court terminated Mother's parental rights pursuant to Section 2511(a)(2), (5), (8), and (b). However, "[w]e need only agree with the trial court as to any one subsection of Section 2511(a), as well as Section 2511(b), in order to affirm." In re B.J.Z., 207 A.3d 914, 922 (Pa. Super. 2019). Accordingly, we analyze the Orphans' Court's decision to terminate Mother's parental rights under Section 2511(a)(8) and (b).

Section 2511(a)(8) provides that a parent's rights with regard to a child may be involuntarily terminated when:

> The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.

23 Pa.C.S. § 2511(a)(8). Thus, a party seeking termination of parental rights under subsection (a)(8) must initially prove, by clear and convincing evidence: "(1) that the child has been removed from the care of the parent for at least twelve (12) months; (2) that the conditions which had led to the removal or placement of the child still exist; and (3) that termination of parental rights would best serve the needs and welfare of the child." In re C.L.G., 956 A.2d 999, 1005 (Pa. Super. 2008) (en banc).

If the record supports termination under subsection (a)(8), the court

must then consider the child's best interests under subsection (b):

> (b) Other considerations.—The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511(b).

Mother first argues the trial court erred or abused its discretion in granting CYF's petition to involuntarily terminate her parental rights under Section 2511(a). Specifically, she contends "[t]here was insufficient evidence to support a conclusion that the conditions that led to the removal of [Child] from the care of Mother still exist."[7] Mother's Brief at 19. Rather, she insists the testimony at the termination hearings demonstrated Child's special medical needs have improved since birth, Mother's anger at certain "other adults" resulted from the fact that she "was not treated appropriately or fairly[, and she] made progress" toward her goals. Id. at 20-22. She asserts

_____

[7] We note Mother does not distinguish subsections (a)(2), (5), or (8). However, all three of those subsections require proof that the conditions which led to Child's removal continue to exist. See 23 Pa.C.S. § 2511(a)(2) (requiring proof that, inter alia "the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent"), (5) (requiring, proof that, inter alia, "the conditions which led to the removal or placement of the child continue to exist"), (8) (requiring proof that, inter alia, "the conditions which led to the removal or placement of the child continue to exist").

"[t]he record does not support a determination that Mother with the proper services in place could not properly care for [Child]." Id. at 22.

Preliminarily, we note that, at the time the termination petition was filed, Child had been removed from Mother's care for 18 months (January 2017 to July 2018). Therefore, the first requirement of Section 2511(a)(8) has been met.

Mother's argument focuses on the second requirement—whether the conditions which led to Child's removal continue to exist. In its opinion, the Orphans' Court detailed the testimony presented at the termination hearings, and documented Mother's failure to meet many of the goals set for her by CYF. The court identified five goals for Mother at the time of Child's placement: (1) mental health treatment; (2) drug and alcohol treatment; (3) stable housing; (4) parenting assistance, including participating in Child's medical appointments; and (5) education and employment. See Orphans' Ct. Op., 10/8/19, at 7-16.

With regard to the goal of addressing mental health, the court observed Mother was "overwhelmed and frustrated that [Child] was not in her care[,]" and became "increasingly distressed, hostile and angry, which culminated in a significant episode out of the court room on June 20, 2018." Orphans' Ct. Op. at 8 (footnote omitted). Despite repeated requests to engage in mental health treatment, Mother did so only sporadically, and failed to provide any corroborating documentation. Indeed, the court noted Mother stopped seeking mental health treatment by September of 2017. Id. It detailed

several incidents with caseworkers after July 2018, when Mother became angry and escalated the situation. Id. at 13-15. Thus, the court found Mother did not adequately address her mental health issues.

Likewise, the court found Mother's participation in drug and alcohol treatment was lacking. Mother had a history of alcohol and marijuana use. Orphans' Ct. Op. at 9. She participated in a program from May 2017 to June 2017, but self-reported that she was no longer working with that program in December of 2017. N.T., 5/19/19, at 46. However, a CYF caseworker smelled marijuana during a visit to her home in March and April of 2018. Orphans' Ct. Op. at 11-12. Although she was recommended for treatment again in March of 2018, Mother has not undertaken any drug and alcohol program since December of 2017. N.T., 5/16/19, at 47-48. Moreover, the court noted that throughout the duration of her case, Mother failed to appear for 18 of 37 random urine screenings. Orphans' Ct. Op. at 9. Accordingly, the court determined Mother failed to meet her drug and alcohol goals.

The Orphans' Court also emphasized that Mother failed to meet her parenting goals. Although Mother successfully completed a coached visitation program from October of 2017 until March of 2018, her first unsupervised visit with Child, scheduled for March 20, 2018, was cancelled when a CYF caseworker smelled marijuana in her residence. Orphans' Ct. Op. at 12. Furthermore, the court found Mother failed to consistently participate in and attend Child's medical appointments, and appeared to some caregivers as if she did not take his medical issues seriously. Id. at 12-13.

With regard to her education and employment goals, the court stated that, at the time the termination petition was filed, Mother was not in school and was unemployed. Orphans' Ct. Op. at 16. She did, however, obtain stable housing through Family Links ARIA and Section 8 subsidies, and had been residing in a home CYF deemed appropriate since February of 2018. Id. at 10; N.T., 5/19/16, at 43-44; Permanency Review Order, 2/21/18, at 3

Accordingly, the Orphans' Court concluded:

> Mother has regrettably been unable to remedy the condition that led to [Child's] removal. [Child has] complex medical considerations and requires a certain level of parental investment, maturity, and awareness for his particular needs that Mother has not been able to achieve. This Court was transparent throughout the pendency of the case, as reflected in permanency review orders, that remedying Mother's issues would require some evidence Mother had attained the maturity and consistency to actively address her mental health, parenting and drug and alcohol goals. Unfortunately, the totality of the record clearly demonstrated that . . . the issues had not been remedied at the time of the termination proceeding . . . .

Orphans' Ct. Op. at 16.

Our review of the record reveals no basis to disagree. There is no dispute Mother made some progress over the course of Child's placement. However, in her brief, she focuses solely on positive reports of her behavior—specific instances when she cooperated with caregivers—and completely ignores the fact that she did not address either her mental health or drug and alcohol issues. See Mother's Brief at 19-20. Furthermore, she attempts to justify her aggressive behavior and anger issues by claiming she was not treated appropriately or fairly by some of Child's caregivers. Id. at 21-22.

However, the Orphans' Court, as fact finder, clearly credited the caregivers' version of events, as was its prerogative. See In re Adoption of K.J., 936 A.2d 1128, 1131 (Pa. Super. 2007) (noting that in a termination case, "[t]he trial court, as the finder of fact, is the sole determiner of the credibility of witnesses and all conflicts in testimony are to be resolved by [the] finder of fact").

Mother also continues to minimize Child's medical issues, implying that because he is "doing better than he was when he was removed," her purported inability to care for his special medical needs is no longer relevant. Mother's Brief at 20. However, Dr. Cook explained that Child still has pulmonary and respiratory concerns that require close monitoring for at least two to three more years. N.T., 5/19/19, at 146, 156. Moreover, CYF Caseworker Lewis testified at the termination hearing that Child's "nutrition . . . is still very slow [and t]here are still a lot of instructions that need to be followed." Id. at 58. The foster care program supervisor, Amy Szymanksi, further explained:

> [Mother] does not seem to prioritize [Child's] medical needs, she does not attend the appointments that she is asked to, she does not attend the after appointments for like when he had his adenoids removed. . . . And [Mother] has made comments, multiple comments over the course of the last couple years that the health issues are not as dire or not as concerning as they are being made out to be which is an issue for us because they are concerning. [Child] has to have very specific care.

N.T., 5/30/19, at 63-64. Considering Child's persistent respiratory and pulmonary issues, Mother's repeated and consistent marijuana use in her home is particularly concerning. See N.T., 5/16/19, at 75, 125, 154; N.T.,

5/30/19, at 21-22.

Despite Mother's progress in some areas, we agree with the conclusion of the Orphans' Court that the conditions which led to Child's removal continue to exist. As this Court has explained:

> We are mindful that the application of Section (a)(8) may seem harsh when a parent has made significant progress in attaining goals that would permit reunification to go forward.
>
>> However, by allowing for termination when the conditions that led to removal of a child continue to exist after a year, the statute implicitly recognizes that a child's life cannot be held in abeyance while a parent attempts to attain the maturity necessary to assume parenting responsibilities. The court cannot and will not subordinate indefinitely a child's need for permanence and stability to a parent's claims of progress and hope for the future. Indeed, we work under statutory and case law that contemplates only a short period of time, to wit eighteen (18) months, in which to complete the process of either reunification or adoption for a child who has been placed in foster care.

Matter of Adoption of M.A.B., 166 A.3d 434, 447 (Pa. Super. 2017) (citation omitted).

Mother next asserts the court erred or abused its discretion in granting CYF's petition to involuntarily terminate her parental rights under Section 2511(b).[8] When considering whether termination of a parent's parental rights

_____

[8] We note that Section 2511(a)(8) also includes a third requirement—proof that "termination of the parental rights would best serve the needs and welfare of the child." 23 Pa.C.S. § 2511(a)(8). The "needs and welfare" analysis under subsection (a)(8) is "distinct" from the analysis under subsection (b), and courts are "required to resolve the analysis relative to Section 2511(a)(8), prior to addressing the 'needs and welfare' of [the child] as proscribed by Section 2511(b)[.]" C.L.G., 956 A.2d at 1009. Here, however, Mother

- 13 -

is justified under Section 2511(b), "the trial court must engage in an analysis of the best interests of the child by taking into primary consideration the developmental, physical, and emotional needs of the child." In re T.M.T., 64 A.3d 1119, 1127 (Pa. Super. 2013).

> As this Court has explained, "Section 2511(b) does not explicitly require a bonding analysis and the term 'bond' is not defined in the Adoption Act. Case law, however, provides that analysis of the emotional bond, if any, between parent and child is a factor to be considered" as part of our analysis. "While a parent's emotional bond with his or her child is a major aspect of the subsection 2511(b) best-interest analysis, it is nonetheless only one of many factors to be considered by the court when determining what is in the best interest of the child."
>
> > [I]n addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent. Additionally, this Court stated that the trial court should consider the importance of continuity of relationships and whether any existing parent-child bond can be severed without detrimental effects on the child.

In re Adoption of C.D.R., 111 A.3d 1212, 1219 (Pa. Super. 2015) (citations omitted).

With respect to Section 2511(b), Mother argues there was no expert testimony presented as to the effect termination of her rights would have on Child's relationship with his sibling. Mother's Brief at 23-24. Mother emphasizes Dr. Terry O'Hara, the psychologist who performed the court-ordered evaluations, never observed Child with Mother and his older sibling,

_____

focuses her argument solely on the failure of CYF to prove termination would best serve the needs and welfare of Child under subsection (b). Mother's Brief, at 22-24. Therefore, we will confine our analysis accordingly.

although he did conduct one evaluation of Child with his foster parents and a foster sibling. Id. at 23. She insists:

> Not only could this have affected how [Child] behaved and interacted . . . with Mother and . . . with foster parents . . . but it also prevented [Dr.] O'Hara from providing and expert opinion as to how the loss of the relationship between [Child] and his brother would affect the needs and welfare of [Child]. The absence of such expert testimony, while not controlling, prevents a determination that termination of Mother's parental rights clearly best serves the needs and welfare of [Child].

Id. at 23-24.

In finding termination of Mother's rights was appropriate under subsection (b), the Orphans' Court noted that it "primarily relied" on the expert testimony of Dr. O'Hara, who, between May 2018 and May 2019, completed an individual evaluation with Mother, two interactional evaluations with Mother and Child, and two interactional evaluations with the foster parents and Child. Orphans' Ct. Op. at 18-19. The court emphasized the following testimony by Dr. O'Hara. During his individual and interactional evaluations of Mother and Child in November of 2018, Dr. O'Hara found that while Mother showed some parenting strengths, Child "resisted sitting on [her] lap, didn't seek her out, squirmed away from her when she attempted to hold him, and wasn't very verbal during the first part." Id. at 19, citing N.T., 8/12/19, at 20-21. Dr. O'Hara noted a "marked difference" during Child's interactional evaluation with foster parents, when Child "was very active, he directed his attention to them, sought affection, sat on their lap, was vocal, calm and smiling . . . all indicators of security for a child in a relationship."

Id., citing N.T., 8/12/19, at 22. Nevertheless, at that time, Dr. O'Hara recommended providing Mother with more time to address her reunification goals. He hoped Mother would engage more with the Child's medical and service providers, and he recommended she participate in "dual diagnosis treatment once or twice weekly." Id. at 19-20. However, at his subsequent evaluation in May of 2019, Dr. O'Hara learned Mother failed to follow through with any of his recommendations. Significantly, Dr. O'Hara "did not notice much change in how [Child] interacted with . . . Mother during that evaluation." Id. at 20. He concluded:

> [I]t was important for [Child] to achieve permanency, given the length of time he had been in care, and this it was his observation that the foster parents provided a home with strong parenting skill, attuned to [Child's] medical and developmental need and one that had demonstrated indicators of security in the relationship. . . . Dr. O'Hara testified, as also indicated in his report, that there would not be much of a detriment to [Child] if rights were terminated to Mother.

Id. at 21. Crediting the opinion of Dr. O'Hara, the Orphans' Court found termination of Mother's parental rights would best serve the "developmental, physical and emotional needs and welfare of Child[.]" Id.

Our review of the record reveals ample support for the trial court's findings. In particular, with regard to the emotional bond between Child and Mother, Dr. O'Hara testified:

> I didn't have much evidence that [Child's] relationship with his mother is meaningful enough, at least from my observational session and from the collateral information as well that these visits are meaningful to him. I didn't have much evidence that [Mother] is engaged when she does actually show to visit with [Child]. I

> don't have much evidence that she is going to be able to effectively collaborate with collateral sources. So in terms of detriment, I think that for a child of [his] age who has been in care for over two years [at the time of the termination hearing], I believe . . . permanency is of importance for a child . . . [and foster parents] are providing, very strong parenting skills to him, they are attuned to his medical and developmental needs. He has shown a lot of indicators of security with his relationship with them.

N.T., 8/12/19, at 41-42. Moreover, Dr. O'Hara emphasized that Mother's inconsistency with visits, particularly when Child has been transported to the visit and Mother failed to attend, is a "detriment" to Child. Id. at 42.

As noted above, Mother's sole challenge under subsection (b) is that neither Dr. O'Hara nor the Orphans' Court considered the effect termination of her rights would have on Child's bond with his sibling. Mother's Brief at 23-24. Dr. O'Hara admitted he did not conduct an interactional evaluation which involved Child's sibling. N.T., 8/12/19, at 39. However, no such evaluation is required under the statute or case law. Indeed, Mother neglects to provide any support for the proposition that a child's bond with his sibling alone may suffice to override a court's determination that a parent's actions or inactions, and the lack of a bond support termination of that parent's rights to the child. Furthermore, Mother also fails to point to any evidence in the record that Child and his sibling had such a significant bond that termination of Mother's rights would not be in Child's best interests. Indeed, Child lived with Mother and his sibling for a month between December 2016 and January 2017, when Child was three months old and his sibling was 17 months old. At the time of the final termination hearing in August of 2019, Child was almost three

- 17 -

years old, and his sibling was four years old. Although Mother did bring the sibling to some of her visits with Child, and the children played together,[9] it is unclear how many of the visits sibling attended with Mother, who, herself, attended inconsistently. There is simply no basis to conclude Child and sibling's bond was so strong that termination of Mother's parental rights— which would necessarily terminate the siblings' bond—was not in Child's best interest. Accordingly, Mother is entitled to no relief on this claim.

Because our review reveals no error or abuse of discretion in the Orphans' Court's decision to involuntarily terminate Mother's parental rights pursuant to 23 Pa.C.S. § 2511(a)(8), and (b), we affirm the order on appeal.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 2/26/2020

_____

[9] See N.T., 5/30/19, at 14, 17, 19, 57.